## THE PEOPLE, *ex rel.* LOEW, *v.* BATCHELOR.

All the members of a corporate body are presumed to have notice of the time of holding its stated meetings, and are bound by the proceedings at such meetings; but there is no presumption that they *know* what is done, so as to charge them with notice of anything there transacted, contemplating future action at a time other than that of a stated meeting.

Otherwise, in respect to an adjourned meeting, held in continuation of a prior one and for the purpose of completing its unfinished business, of which due notice has been given, or is to be implied.

The board of aldermen of the city of New York, appointed a day for the election of a city officer; at a subsequent stated meeting of the board, the resolution was rescinded and it was determined to go at once into the election.   Some of the aldermen being absent from the last meeting and having no notice of the election: *Held*, that the election was void.

The legislature may repeal, or modify an act, providing for the election of successors to local officers in the city of New York, so as in effect to extend the term of the persons then in office.

The People, *v.* Batchelor.

Such an enactment is not an appointment to office by the legislature in contravention of article 10, section 2, of the Constitution of 1846.

APPEAL from the Supreme Court. Action in the nature of *quo warranto* to recover the possession of the office of clerk of the first district court in the city of New York. Upon the trial before Mr. Justice E. D. SMITH, a jury having been waived, these facts were found: The defendant was duly appointed to the office in question, December 31, 1851, qualified and entered upon its duties. By the law in force at the time of his appointment (Sess. Laws of 1851, p. 598, § 7), the clerks of the district courts were to enter upon the performance of their duties at the same time and to "hold their offices for the same period as the justices to be elected" under the act. By the same section the justices were to be elected in November, 1851, and every six years thereafter; and the justices first elected were to hold their office until December 31, 1857. By an act passed April 13, 1857 (Laws of 1857, vol. 1, p. 726), it was provided that the clerks of the district courts, "who shall be in office at the next election of judges for said courts, shall hold their offices for the same term as the justices then elected." The election of justices was in December, 1857, and the defendant claimed, by virtue of the act last cited, to hold over for a new term of six years.

The relator claimed that the act of 1857 was unconstitutional, and that he had been appointed as follows: On the 14th December, 1857, a majority of the board of aldermen of the city of New York, passed resolutions to give notice to the mayor that they would meet in convention on the 21st December, for the purpose of selecting clerks of the district courts in the place of those whose term was (as it was claimed) to expire at the end of the month, and invited the mayor to nineteen aldermen; meeting. There were present and voting bepresent at this the remaining three members of the board were absent.

On the 18th December, 1857, there was a stated meeting of the board of aldermen, at which seventeen were present,

five being absent.   The resolution of the 14th December was rescinded, and a resolution was passed inviting the Mayor to meet the board at half-past six o'clock of that evening, in convention, for the purpose of appointing district clerks.   Within ten minutes after the passage of this resolution the board of aldermen adjourned, and the mayor, Fernando Wood, entered their chamber, took the chair and organized the convention. The relator was then appointed clerk of the district court for the first district.

None of the aldermen had notice of the convention of the 18th December, except those who were present when the resolution calling it was passed.

The judge held the provision of the act of 1857, by the operation of which the defendant was continued in office, to be constitutional and valid, and ordered judgment for the defendant; which having been affirmed at general term in the first district, the relator appealed to this court.

*Abraham R. Lawrence,* for the appellant.

*David Dudley Field,* for the respondent.

SELDEN, J.   The first question which I shall examine is, whether the plaintiff Loew was duly appointed to the office he claims, assuming that there was a vacancy to be filled.   This depends upon the question, whether it was necessary to give any notice to the absent aldermen, of the resolution of the 18th of December, 1857, inviting the mayor to attend a convention upon the same afternoon, for the purpose of making the appointments authorized by the act of April 10, 1855. (Sess. Laws, 1855, p. 502.)   As this statute expressly provides, that the powers conferred may be exercised at a convention which is attended by a majority only of the board of aldermen, the question whether, in the exercise of such powers, by a number of persons acting either in a corporate capacity or as private individuals, it is necessary, at common law, that the whole number should actually assemble, does not arise.   As a

majority of all the aldermen not only attended the convention at which the appointment in question was made, but actually voted in favor of such appointment, I regard the question of notice as the only one presented. I shall assume, for the purposes of this case, that the power of making these appointments is conferred upon the mayor and aldermen in their corporate capacity, and that in the exercise of this power they act not as individuals, but as a corporation. This certainly is the most favorable view of the case which can be taken for the plaintiff Loew, since if they act as individuals merely, the necessity of giving notice would no doubt be more apparent than if they are considered as acting as a corporate body.

It should be observed in the outset, that the inquiry is not whether it was necessary to give any notice previous to passing the resolution calling the convention at which the plaintiff was appointed. The counsel for the appellant, is, I think, right in the position, that such a resolution might be passed at any stated meeting of the board without any preliminary notice. But the question is, whether such of the aldermen as were absent at the time of the adoption of the resolution, were not entitled to some notice of the time fixed for the election; or whether, on the other hand, that time might lawfully be so arranged, as effectually to prevent the possibility of their obtaining any notice.

The appellant's counsel assumes, in his printed points, that every member of the board of aldermen "is conclusively *presumed to be cognizant* of all the proceedings taken at a regular or stated meeting of such body whether he was present at or absent from such meeting." In this assumption lies the fallacy of his argument. The proposition is too broad. It is true that every member of the board is bound by whatever is done at any stated meeting within the range of the ordinary duties of the board; and no member has any right to object on the ground that he was not present; because all the members have, or are presumed to have, knowledge of the times for holding the stated meetings, and if any member fails

to attend he voluntarily waives his right to participate in the business of the meeting. But this is a very different proposition from the one that he is presumed, although absent, intuitively to know all that is done at the meeting, so that when something is done which contemplates future action, not at a stated meeting, he is presumed to have notice of the time appointed for such action, even although, as in this case, that time is so fixed as to render it nearly impossible that he should have any actual notice.

If the proposition of the counsel is sound, then a corporate body possessing the power of amotion, may appoint at a stated meeting a time for removing an absent officer of the corporation, and at the time appointed may, unless the charter or by-laws contain some special provision on the subject, actually remove him without giving him any notice of the proceeding; and may even make the time so short as to render notice impossible. I think I hazard nothing in saying, that the law of corporations contains nothing which gives any countenance to such a doctrine.

The case of *City of London* v. *Vanacre* (5 Mod., 438), cited by the counsel, was very different from this. There the defendant Vanacre had been elected to the office of sheriff of London, at the regular annual election held upon Midsummer day, and had neglected to take upon him the office, and give the bond required by a by-law of the city; and the question was, whether he was liable to the penalty which the by-law imposed. He urged as one ground of defence that he had received no notice of his election; but the court held that he was bound to take notice at his peril. Now an election in the city of London is an open, public and notorious event, and it is hardly possible to suppose that a citizen elected to the important office of sheriff at such an election, could for any considerable length of time be ignorant of the fact. The court gave this as one of the reasons for its decision, and it is, I think, abundantly sufficient to support it. The Chief Justice said: "The election is made in view of the city, of which all persons are to take notice as members of the body politic; and the

proclamation is also made in the most notorious place of the city, viz. : on the hustings, where every person may take notice of it." It is true he also says that every citizen is presumed to be present, where the whole body politic is assembled ; but the decision really rests, I apprehend, not upon this fiction of presence, but upon the irresistible presumption that no citizen could be ignorant of so notorious an event.

In the more modern case of *Scadding* v. *Lorant* (5 Law & Eq. R., 16), which was also cited, the question was as to the validity of a certain tax, or poor rate imposed upon the parishioners by the vestry of the parish of St. Pancras. The rate was imposed at an adjourned meeting of the vestry, and one ground taken by the counsel was, that no sufficient notice had been given of such adjourned meeting ; the notice actually given having omitted to state the purpose for which the meeting was to be held. It was conceded that the notice given of the original meeting was in all respects regular and sufficient. This case went from the Court of Queen's Bench, where it was commenced, through the Court of Exchequer Chamber to the House of Lords, where, to a question as to the sufficiency of the notice, the judges, by the Lord Chief Baron, responded as follows : " We are unanimously of opinion that the rate was not rendered invalid by reason of the alleged defect in the notice of the adjourned meeting. It was sufficient to give notice on the church door of the purpose for which the *first* meeting was to be held, and that notice having been duly given, we think that the notice so given extended to all the adjourned meetings, such adjourned meetings being held *for the purpose of completing the unfinished business of the first meeting, and being in continuation of that meeting.*"

This case, so far as it has any bearing upon the present, weighs decidedly against the position of the appellant's counsel. It is plainly implied in what was said by the Chief Baron, that in order that notice of a prior meeting should extend to one which is subsequent, the latter must be held for the same purpose, and as, virtually, a mere continuation of the first meeting. Here the second meeting not only was not to complete the

unfinished business of the first, but was to do that which could not have been legally done at all at the previous meeting. Neither was the second in any sense a continuation of the first meeting, but an original meeting of a new and distinct body. The general notice which every member is presumed to have of the stated meetings of the board of aldermen, could therefore, in no manner, according to the principles of the case of *Scadding* v. *Lorant,* extend to the convention at which the plaintiff Loew was appointed.

It is of course indispensable for the appellants to show, that all the members of the appointing body had notice of some sort, either actual or presumptive, of the time fixed for making the appointments. It would be absurd to hold that a portion only of those to whom a power of appointment is confided can get together and exercise the power without notice to their associates. It is not only a plain dictate of reason, but a general rule of law, that no power or function entrusted to a body consisting of a number of persons, can be legally exercised without notice to all the members composing such body. Wilcock lays down this rule in respect to municipal corporations. He says: "All corporate affairs must be transacted at an assembly convened *upon due notice,* at a proper time and place; consisting of a majority of the persons of each class, to which the prescription or charter has confided the power." (Wil. on Mun. Corp., § 58.) The same rule applies to private corporations (Angell & Ames on Corp., ch. 14, § 1), and as the reason of the rule, so no doubt the rule itself, applies with equal force to all aggregate bodies although unincorporated.

It is not pretended that there was any notice in fact in the present case, and I think it has been shown that none can be deduced either from the unfounded fiction, that every member of the board is presumed to know all that is done in his absence, by the board of aldermen, or from the well founded presumption, that every member is cognizant of the times fixed for holding the regular meetings of such board. I am therefore clearly of the opinion that the appointments made at the

convention held upon the 18th of December, 1857, were void for the want of due notice to the aldermen who were absent.

The next question is, whether that branch of the judgment of the Supreme Court which declares, that the defendant Batchelor lawfully holds, and has not usurped or intruded into the office in question, is or is not erroneous. The ground upon which it is alleged to be erroneous is, that so much of section 71, chapter 344, of the Laws of 1857, as enacts that the clerks of the district courts of the city of New York, who should be in office at the then next ensuing election of the judges of said courts, should hold their offices for the same time as the judges then to be elected, is in conflict with section 2 of article 10 of the State Constitution, which provides, that all city officers whose election or appointment is not provided for by the Constitution "shall be elected by the electors of such cities (&c.), or of some division thereof, or appointed by such authorities thereof as the legislature shall designate for that purpose."

The clerks of these courts in office at the time of the passage of the act of 1857, and at the then next ensuing election of judges of said courts, of whom the defendant Batchelor was one, were appointed by the mayor and board of aldermen, under the act of April 11, 1851. (Sess. Laws, 1851, ch. 147, § 1.) By that act they were to be appointed on or before the 31st of December, 1851, and to hold their offices for four years. A subsequent act passed at the same session (ch. 514, § 7), providing for the election of justices of the district courts—those first elected to hold their offices until the 31st day of December, 1857, and those thereafter elected to hold for the period of six years from the expiration of their previous term—contained a provision making the term of the several clerks of these courts correspond with that of the justices. The effect of this provision was to extend the terms of the clerks appointed under the act of April 11, 1851, from the second Tuesday of May, 1856, when they would otherwise have expired, to the 31st day of December, 1857.

It will be seen, therefore, that but for the act of 1857 (Sess. Laws, 1857, ch. 144, § 71), the terms of the clerks then in

office would have expired on the 31st of December, 1857, and in that case it would have been the right and the duty of the mayor and board of aldermen, on or before that day, to have proceeded under the act of April 10, 1855 (Sess. Laws, 1855, ch. 293, § 1), which had taken the place of that of April 11, 1851, to appoint the several clerks, for a new term of six years; as by the resolution and convention of the 18th of December, 1857, they attempted to do. But by section 71 of the act of 1857, which provided that the clerks in office at the time of the next election of justices should continue to hold their offices "for the same time as the justices then elected," the terms of those clerks were extended for six years from the 31st of December, 1857, when they would have expired by virtue of the acts of April 11 1851, and July 11, 1851, under which the appointments were made; and the question upon this point is, whether the legislature was precluded, by the constitutional provision to which I have referred, from thus extending the terms of these officers.

In considering this point I shall assume, that the officers in question are city officers, within the meaning of section 2, article 10 of the Constitution. I regard them as clearly belonging to that class of local officers, for the election or appointment of whom that section was intended to provide. But it by no means follows that the legislature, in passing the act of 1857, has transcended its powers. The Constitution provides simply for the election or appointment of these local officers, but says nothing about the length of their respective terms. If, therefore, the act of 1857 can be justly said to have elected or appointed the clerks in question it is in conflict with the Constitution; otherwise not. The statute certainly does not in terms purport either to elect or appoint. It simply provides that persons already in office, and who have received their appointment from a legitimate source, shall continue to hold their offices, &c.

But it may be said, that their original appointment being for a special term which has expired, the act of 1857 was in effect a reäppointment for a new term of six years. This argument

overlooks the fact that no constitutional term is prescribed. The only limitation upon the term was purely legislative; and what the legislature may do, it may undo, unless prohibited by some provision of the Constitution. There is nothing in the Constitution which either expressly or by implication restrains the legislature from altering or changing the term of any office which it has once fixed. The whole arrangement of the time for which these local offices shall be held is left entirely to the discretion and control of the legislature, to be regulated from time to time as the legislature may see fit. The only form, in which, as it seems to me, the argument against the validity of the law in question can be presented with any apparent force is this: It may be said, that the authority of the mayor and aldermen to appoint, having been limited to the specific term prescribed by the legislature, the whole power and force of their appointment was necessarily exhausted when that term expired; and hence that the office could not be legally held beyond that time except by virtue of some new appointment.

This is plausible, but the answer will be found in that section of the Revised Statutes which provides, that every officer properly appointed who shall have duly entered upon the duties of his office, "shall continue to discharge the duties thereof, although his term of office shall have expired, until a successor in such office shall be duly qualified." (1 R. S., 117, § 9.) This statute is to be taken in connection with that which specifically conferred the appointing power upon the mayor and aldermen; and their combined effect was to authorize those officers to appoint for the prescribed period and until a successor should be duly appointed and qualified. Hence the force of their appointment would not necessarily cease at the expiration of the specified term. If, therefore, the legislature, in 1857, had in direct and explicit terms provided that no action should be had under the Laws of 1851, or 1855, authorizing the mayor and aldermen to appoint until December, 1863, these clerks would have continued to hold their offices by virtue of their original appointment, until that period. This is precisely what the legislature has in effect done by the present law.

They have said the clerks now in office shall hold over until a certain time. This is simply saying that no new clerks shall be appointed until that time. Could not the legislature do this? No one I think can doubt the power of the legislature to withdraw entirely, or postpone, the exercise of an authority conferred by itself alone upon the mayor and aldermen. No provision of the Constitution contains any restriction upon this power. I am prepared, therefore, to hold that the law in question, which in effect does no more than this, is not in conflict with the Constitution.

The judgment of the Supreme Court should be affirmed.

In so much of the preceding opinion as relates to the irregularity of the relator's election, COMSTOCK, Ch. J., DAVIES, CLERKE, WRIGHT and BACON, Js., concurred, and the other judges expressed no opinion. In so much as relates to the constitutionality of the act of 1857, extending the defendant's term of office, DAVIES, WRIGHT, BACON, and WELLES, Js., concurred. COMSTOCK, Ch. J., DENIO and CLERKE, Js., dissented, for reasons thus stated by DENIO, J., in the case of *The People, ex rel. Osgood,* v. *Peers,* decided at this term upon substantially the same state of facts:

DENIO, J. (Dissenting.) The defendant was duly appointed to the office of clerk of the district court, from which it is sought to oust him, on the 31st December, 1851, for a term which expired on the same day in the year 1857. He claims to continue the incumbent of the office by virtue of an act of the legislature, passed in April of the last mentioned year, the effect of which, if constitutionally valid, is to extend his official term for a further period of six years. (Laws of 1857, p. 726, § 71.) If his position is sustained he is still in office; and, without examining any other question, he will be entitled to judgment.

The plaintiff challenges this legislation as a violation of the Constitution. He maintains that the office is a city office within the meaning of section 2 of article 10, which declares

The People *v.* Batchelor.

"that all city, town and village officers whose election or appointment is not provided for by this Constitution, shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof as the legislature shall designate for that purpose." This section further provides, that "all officers whose offices may be hereafter created by law, shall be elected by the people or appointed as the legislature may direct." The plaintiff's position is, that the place can only be filled by election, or appointment by the local constituency; and that, although the defendant's appointment for the primary term was valid, the renewal or extension of that term by the act of the legislature was a violation of the provision referred to, and, consequently, was void.

The first inquiry is, whether this clerkship is a city office? At the time of the adoption of the Constitution, the appointment was vested in the mayor, aldermen and commonalty of the city, which body had also the power of removal. (Laws of 1820, ch. 1, p. 3, § 5.) So far as the manner of selecting the incumbent was concerned, it was one of the offices of the city. Then the duties were all to be performed within the city. It is true, they appertain to the administration of justice, which is a subject of universal concern; but it is the administration of justice within a particular local division with which the office is conversant. It was never doubted but that justices of the peace, out of the cities, were county or town officers. They were formerly appointed by the central government; but their duties were all to be performed within some county, and hence they were county officers. After they came to be chosen in the towns, a question arose whether they continued to be county officers or were town officers (*The People* v. *Keeler*, 25 Barb., 421; *S. C.*, 17 N. Y., 370); but it is very plain that they were either one or the other. The functions of those clerks have the same character of locality with that of the justices whose clerks they are, and the justices are officers of the same description within the city as justices of the peace are in the other counties.

Hence, I think it very plain that the clerks are city officers, within the sense of the constitutional provisions.

But though they are city officers, yet, if their offices have been created since the formation of the Constitution, the legislature is free to provide for their appointment in any manner they may think expedient, or to make the appointment themselves. (*The People* v. *Draper*, 15 N.Y., 537, 538.) The question upon this part of the case is, whether the office of justices' clerk existing when the Constitution was made, is the same office which the defendant fills, and which is the subject of this controversy. These New York justices' courts have been the subject of frequent legislative regulations, but I am of opinion that their identity and the legal identity of the clerks have been preserved. When the Constitution was framed they existed under the act passed in 1820, already referred to. There were, according to that act, four justices then called assistant justices, to each of whom a defined portion of the city was assigned. Each justice was to have a clerk, to be appointed and to be removable by the mayor, aldermen and commonalty. The defendant's counsel argues that the offices of those clerks have been abolished, and new offices created—of one of which the defendant is an incumbent—since the adoption of the Constitution, and that the provision consequently does not apply. This depends upon the construction to be put upon the subsequent legislation.

In 1848, it became necessary to change the mode of appointment of the justices, to meet the provision of the Constitution requiring judicial officers of this class to be elected. (Art. 6, § 18.) By the act then passed there were to be six judicial districts, and the justices were to be chosen at a charter election, and the clerks were to be appointed by the common council; and both the justices and the clerks were to hold their offices for four years. (Laws of 1848, p. 249.) The style of assistant justices, before used, was changed to justices; but all the provisions of law applicable to the former justices and their clerks were declared to apply to those mentioned in the act. (§ 4.) The jurisdiction as to amount was raised from $50 to $100. In

terms, the former offices of assistant justice and assistant justices' clerk were abolished. (§ 10.)   At the same session of the legislature the former name of assistant justices' court was restored, so as to accommodate these courts to a provision of the Code of Procedure which had referred to them by that name. (Ch. 276.)   This act of 1848 was twice amended in 1857.   The first amendatory act required the clerks to be chosen by "the mayor and board of aldermen, or a majority thereof." (Ch. 147.) The other act of the same session established a new official term for the justices.   They were to be chosen in November, 1851, and every six years thereafter, at the general election. Those first elected were to commence to serve on the second Tuesday of May succeeding their election; and those after-wards chosen, on the first day of January after the election The official term was to be six years.   It was then provided " that the clerks of these courts hereafter appointed, shall enter upon the performance of their duties at the same time, and shall hold their offices for the same period as the justices " to be elected under the act.   This was the construction of the law, as to the constitution of the office, when the defendant was appointed in December, 1851.   According to the strict language of the act of 1848, the former office was abolished and a new one was created. But I am of opinion that for all substantial purposes, and especially as regards the application of the constitutional pro-vision under consideration, the former office is to be considered as continuing, under certain necessary modifications.   The sys-tem of justices' courts was the nucleus to which the justices and the clerks were attached.   These were the ancient courts of the city, which had been created for the trial of small causes.   As the city increased in business and population, the system required to be expanded ; and, with the diminishing value of money, and the increase in the amount of ordinary transactions, the limit as to the amount for which judgment might be given was increased.   The circumstance which establishes the essential identity in legal character of the courts, and their judges and clerks, is the direction in the fourth section, that all the provisions of law respecting the former

courts should apply to those referred to in the act. The clause proposing to abolish the former offices and to create new ones was, in substance and effect, a simple change of name; and the other provisions of the act were only modifications of the functions of the courts and their officers. The Constitution took effect upon these clerks as city officers, and declared that they should be elected or chosen by the people or by some authority of the city; and it continues to attach to them, notwithstanding the change of name and the subsequent modification of their functions. (*The People* v. *Draper, supra,* 539.)

The same considerations apply to the acts of 1855, chapter 293, and 1857, chapter 344. They were regulations of the courts and their officers, but in no respect changed their legal identity.

It follows from what has been thus far said that the legislature could not itself appoint to this office; and the remaining question is, whether the provision contained in the act of April, 1857, is not an appointment of the defendant and the other clerks for an additional term of six years. It declares that "the clerks of these courts shall be appointed and hold their offices in the manner now provided by law; and vacancies in their office shall be filled in like manner; *provided, however, that the clerks of said courts who shall be in office at the next election of judges for said courts shall hold their offices for the same time as the justices then elected.*" (Laws of 1857, ch. 344, § 71.) When the statute was passed, in the spring of 1857, both the justices and the clerks were serving the last year of their respective official terms, which would expire on the last day of that year. The election of justices, as to which no change was made by the act, would take place on the first Monday of November ensuing, and the justices who should be elected would hold their offices for six years from the ensuing first day of January. According to the existing law, a new appointment of clerks was required to be made at some convenient time in advance of the expiration of their offices, so that their successors would be able to enter upon their duties, as required by law, at the commencement

of the next year, along with the justices chosen at the November election. Thus, it will be seen, that it was not the purpose of the act to alter in any way the mode or time of appointment, or the official term of the justice; and no change in these respects was to be made as to the clerks, except for this one occasion. Indeed, unnecessary care is taken to declare that the general regulations as to the appointment and the term of office of the clerks are unaltered, except by the proviso. It is to be observed that the terms of the justices and of the clerks had been so adjusted by the act of 1851, as to commence and expire at the same time; and this arrangement, as a general regulation, was not changed. The effect of the provision was simply, that for one term the system as respected the clerks was to be intermitted, the legislature itself assuming to provide for the exigency, and for that purpose ordaining that the clerks found in office on the first Monday of November, should serve for another term; during which term the existing law was suspended. This seems to me such a palpable violation of the Constitution as only to require to be stated to be seen and admitted by every one. The Constitution had provided that the power of appointment should reside in a city constituency —either the electors of the city acting directly, or some existing intermediate local official agency. In obedience to the constitutional injunction, the legislature had designated an appointing board consisting of city magistrates, and had directed that the appointments should be for successive terms of six years; and then, after one set of appointments have been made, and the terms of the appointees are about expiring, the legislature intervene, suspend the agency thus created, and themselves appoint for the next term, selecting the existing incumbents for the appointees. It is no answer to say that the proper appointing power had once designated these individuals for the offices in question. True, they named them for the then ensuing term, but they did not—and they were not permitted to—say whether they would approve of their appointment for a longer time, or for another term.

There are a few cases where *ex necessitate* there may be a temporary departure from a mode of appointment provided by the Constitution. For instance, the clerks of counties are made elective by the people; but as an election cannot be held every day, but a vacancy may occur at any time, the courts have countenanced legislative provisions for an executive appointment till an election according to the forms of the Constitution can be held. (*The People* v. *Snedeker*, 14 N. Y., 52; *People* v. *Fisher*, 24 Wend., 215.) But the act under consideration is not of such a character. It was not passed to supply any defect in former laws or to provide for an exceptional case. The provision is not incidental to any change which the legislature were making in the constitution of these offices, for they were making none. It was not *apropos* to anything; but was an independent piece of legislation having no other conceivable object except to ingross the appointment to these clerkships, to which it was constitutionally impossible they could have any right, for a term of six years. The provision conferred no title upon the defendant, whose situation is precisely the same as though no such statute had been attempted to be enacted.

But though the defendant has no title to the office under the act of 1857, he had a right under the general law to hold over until a successor should be appointed and qualified. (1 R. S., 117, § 9.) For the purpose of determining his right under this provision, as well as to enable us to pronounce a judgment upon the right of Osgood, the relator, and who is joined with The People as plaintiff, it is necessary to examine another of the questions made in the case.

The statute for the appointment of clerks was modified the last time by the act of April 10, 1855 (ch. 293, § 1), and is in the following words: "The mayor of the city of New York and the members of the board of aldermen of said city, or a majority of them, shall meet in convention when directed by the board of aldermen or a majority of the members, and appoint the police clerks and clerks of the district courts in said city. It shall, nevertheless, be lawful, if the mayor, after a notice of eight days from the board of aldermen, shall neglect

to appear, for the members of the board of aldermen or a majority thereof, to proceed to appoint the clerks of the said courts, in the same manner and with the like effect as if the mayor was present." It appeared that there was a regular meeting of the board of aldermen held on the 18th day of December, 1857, seventeen aldermen being present, at which a resolution was adopted, inviting the mayor to meet the aldermen in convention the same evening at half-past six o'clock, for the purpose of appointing the district court and police clerks. The mayor appeared at the time named and a convention was accordingly formed, at which the mayor and sixteen aldermen appear to have been present and to have voted. An appointment of clerks for the seven districts was then made by resolution, thirteen members voting in the affirmative. Among the persons so appointed was John J. Ware, who was named the clerk of the second district, which is the office of which the defendant in this action claims to be the incumbent. The board of aldermen at this time consisted of twenty-two members. Prior to the 18th of December, to wit, on the 14th day of that month, the board had adopted a resolution to meet in convention to make these appointments on the 21st of December; but this resolution was rescinded at the meeting of the 18th, prior to the passage of the one by which it was determined to go into convention on the same evening. The case states that Ware took the oath of office and gave a proper official bond, and has demanded the office of the defendant, and is still living and a claimant of the office.

For some reason not explained in the papers, the board of aldermen and the mayor continued to hold conventions for the purpose of filling the offices, as though nothing effectual had been done in December, 1857, in the ensuing years 1858 and 1859; and, finally, on the 9th day of November, 1859, a convention of nine members of the board of aldermen was held, at which a full set of clerks was appointed by ballot. Among these was the relator, who was chosen clerk of the second district. Being of opinion that there was not at that time any legal occasion for making choice of a clerk, I have not particu-

larly examined the other questions arising upon the validity of this alleged appointment. I am satisfied that J. J. Ware was legally chosen on the 18th of December, 1857, and that consequently the office was full when it was attempted to appoint the relator. The objection to the proceedings of that day is, that it was not shown that all the members of the board of aldermen had notice of the time and place of holding the convention; and, in point of fact, it was not shown that any notice was given except such as was afforded by the passage of the resolution of the board fixing the time of meeting in convention. It is a well settled rule, that where a duty of a public nature is entrusted to a plurality of individuals or official persons, a majority are competent to determine, though it is necessary that all should have notice and be afforded an opportunity to participate. But the rule plainly has no application where the duty is cast upon a deliberative body or an administrative board, which holds stated or regular meetings, for the performance of its appropriate duties. If an additional public duty is committed to such a body, it is, in judgment of law, to be performed in its collective character, and not as isolated individuals having no other principle of cohesion, and requiring to be brought together by special notice. The aldermen, as a branch of the municipal government, frequently meet as a board for the performance of their functions. An act of 1851 had committed the appointment of these clerks to the mayor and board of aldermen, but had not declared what should be the consequence if the mayor should refuse or neglect to meet the council. As a joint meeting would be requisite to make the appointment, it would always be in the power of the mayor to prevent one being made, by abstaining from attendance. The act of 1855, now under examination, seems to have been passed to remedy this defect. Power was given to the board to initiate the movement, by directing that a joint meeting should be held at a given time, and then, if the mayor, after having had a notice of eight days, should fail to attend, the aldermen could make the appointment without him. I am persuaded that the amendment had no other object than

the one mentioned. The words members of the board of alder-men are, it is true, used; but not, as I think, with any design to make their ultimate action separate or individual, in any different sense from what it would have been under the act of 1851. It is probable that a majority of the aldermen have the power, out of the board, to direct a joint meeting, and, in such a case, it may be that notice should be given to all the members. But this power is equally given to the board, and in this case, the resolution for the convention was adopted at one of its regular meetings. It was the act of the board, and not of the individuals as separate public officers. The board, as well as each of its members, were concluded by this act, and each was legally chargeable with notice, and no other notice was required to be given.

The result of these views is, that the judgment of the Supreme Court should be reversed, and that judgment of ouster should be given against the defendant. He has no title to the office, in the light of an incumbent awaiting the choice of a successor; for Mr. Ware was legally chosen to succeed him. The relator has no title, for the office was filled by a regular appointment before the proceedings upon which he relies were taken.

Judgment affirmed.