*IN THE MATTER OF THE APPLICATION OF THE BROADWAY SURFACE RAILROAD COMPANY FOR THE APPOINTMENT OF COMMISSIONERS.

*Surface railroads — construction of the statutes relating to, in cities and villages — 1884, chap. 252 — the consent of the local authorities may be procured after that of the property owners — the reasons for the refusal of the owners to consent need not be given — only owners whose names appear on the assessment-roll are entitled to notice.*

Where a surface railroad company has been unable to obtain the consent of property owners to the construction of its road, as required by chapter 252 of 1884, it may apply to a General Term of the Supreme Court for the appointment of three commissioners to determine whether or not the railroad should be constructed and operated, without first obtaining the consent of the local authorities of the city.

Such consent is in all cases an absolute prerequisite to the acquisiton of the right to construct any surface street railroad under the act, but it may be procured either after or before that of the property owners, or after or before the application to the court.  (DANIELS, J., dissenting,)

It is sufficient to sustain such an application that the affidavits show that the consent of the property owners "cannot be obtained."  The reasons for the refusal need not be given.

The fifth section of the act requires notices of the application to be served upon those property owners only whose names appear upon the assessment-roll. Occupants or lessees whose names do not appear upon such roll are not entitled to notice.

APPLICATION for the appointment of commissioners to determine whether a surface railway should be constructed and operated in Broadway in the city of New York,

Chapter 252 of the Laws of 1884, providing for the building of surface railroads in cities, made it one of the conditions that a majority of the abutting owners should consent, or that on failure to obtain such consent, an application should be made to the General Term for the appointment of commissioners to determine and report whether the road should be constructed.

Soon after the passage of the act two corporations were formed, one the Broadway Surface Railroad Company, the other the Broadway Railroad Company.  In the spring of 1884 both of these corporations applied to the General Term for the appointment of

---

* Decided December 19, 1884.

commissioners, and a commission consisting of Messrs. Harris, Vance and Lord was appointed. The commission thereafter sat and heard testimony. The testimony offered by the companies was practically taken together. Subsequently the question was raised whether, under the wording of the act, the commission could be appointed prior to obtaining the consent of the common council for the building of the road. The Broadway Surface Railroad, which claimed to have then procured a consent from the common council, thereupon withdrew from that proceeding and made this application to the General Term for the appointment of commissioners.

*Charles P. Miller, John L. Cadwalder* and *John E. Parsons* for the property holders.

*Robinson, Scribner & Bright,* for the petitioner.

Davis, P. J.:

That act of May 6, 1884, entitled " an act to provide for the construction, extension, maintenance and operation of street surface railroads and branches thereof in cities, towns and villages," provides two modes in which a railroad company organized under its provisions may acquire a right to construct and operate such street surface railroads. One of these modes is by obtaining, after the passage of the act of 1884, the consent in writing of the owners of one-half in value of the property bounded on that portion of the street or highway upon which it is proposed to construct or operate such railroad, and the consent of the local authorities having control of the same. The other mode is by applying, in case the consent of the owners of one-half in value of the property cannot be obtained, to a General Term of the Supreme Court for the appointment of three commissioners to determine, after a hearing of all parties interested, whether such railroads ought to be constructed and operated, and obtaining the confirmation of their report, if favorable to such construction, by said General Term of the Supreme Court; and also obtaining the consent of the local authorities. In cities the common council of the city, acting subject to the power possessed by the mayor to veto ordinances, is declared to be the local authority with power to give the consent required by the act; and provision is made for the form of an application for the

consent of the common council, and the proceedings to be taken on such application before the consent is given. The act declares that such consent of the common council shall operate also as the consent of the city as the owner of any property upon and along the street through which the proposed railroad is to be constructed, except that when such city property is a public park or square, the consent of one-half the owners of property on the other side of the street, and opposite the park or square, shall also be obtained. The act further declares that for its purposes the value of the property bounded on the street to be occupied by the railroad shall be ascertained and determined from the assessment-roll of the city confirmed or completed last before the common council shall have given its consent, except that the value of the property owned by the city shall be ascertained and determined by allowing therefor the same price or value as is shown by such assessment-roll to be the value of the equivalent in size and frontage of any adjacent property on the same street. It will thus be seen by these several provisions of the act that the consent in cities of the common council is an absolute prerequisite in all cases to the acquisition of the right to construct any surface street railroad under the act.

There is nothing in the act prescribing the order in which the several steps of either mode must be taken ; nor is it, we think, at all material to the acquisition of the right to construct a railroad that such steps shall be taken in any particular order. It is enough that steps required by either mode shall appear to have been actually taken and consummated, within the intention of the act, before the power to construct a railroad is exercised.

It is thought and strenuously argued that, because for the purposes of the act the value of the property and its ownership for the purpose of serving notices, under the fifth section, are to be ascertained and determined from the assessment-roll of the city confirmed and completed last before the local authorities shall have given their consent, therefore the consent of the common council must be obtained before any other step can be taken. But this construction does not seem to us to be either a necessary or a reasonable one. The sole purpose of the provision is to declare from what assessment-roll of the city such valuation and ownership must

be ascertained, so as to exclude the use of any other assessment-roll than the one thus defined and pointed out by the act. When it appears that the assessment-roll from which the value and owner-ship for the purposes of the act have been taken, is in fact that con-firmed and completed last before the common council has given its consent both the spirit and the letter of the statute are complied with.

If it were the intention to provide that the consent of the com-mon council to the construction of a road must in all cases be obtained before any other of the steps required by the act can be taken, the legistature would doubtless have so expressly enacted and not left so important a requirement to be ascertained only by inference, or arguments from doubtful language. Such a construc-tion would have the effect to annul the written consent, duly acknowledged of every property owner on a street, if such consent happened to be given before the common council had given its consent although such consent of the common council was given upon undoubted evidence that the assessment-roll, upon which the value was to be ascertained, was that confirmed and completed last before the action of the common council. Besides it is manifest that a rigid construction of the character now under consideration might be used to operate to exclude all competition, and invest the common council with a power greater than is intended by the act.

The act intended to give to the consent of the property owners great weight before the common council in determining whether its consent should also be given; and where several roads are con-temporaneously making applications to the common council for its consent, the manifest desires of the property owners along a street, expressed in the binding manner indicated in the act, ought to and doubtless would have great influence with that body. But no com-pany would seek to obtain the consent of property holders in advance of the consent of the common council if it were to be regarded as a nullity and required afterwards to be repeated. It is enough, in our judgment, to comply with the requirements of the act that it appears that all the several steps have in fact been taken and con-summated within a period of time which shows that the assessment-roll of the city, confirmed and completed last before the common council gives consent, has actually had the effect and operation indicated by the statute. Either of the several steps requisite to

acquire the right under the act may be primarily taken, and all of them may proceed *pari passu;* but when the process is complete it must appear that each one has been consummated, so that the prescriptions of the statute are satisfied.   Indeed it would not in any case be an unreasonable requirement on the part of the common council, before giving its consent to any projected railroad, that it should first show that the construction of such road is consented to by the property owners, or that the propriety of its construction has been certified by a commission with the approval of the court. We think, therefore, there is no force in the objection that the application to the court in this case preceded the consent which now appears to have been given by the common council of the city.

But it is objected that the value of the property has been ascertained and determined in this case by the assessment-roll of 1883, instead of the assessment-roll of 1884.   It is true that it was so ascertained in the original application.   But inasmuch as the assessment-roll of 1884 was confirmed and completed in August last, while the proceedings were pending on the former application, and before the consent of the common council had been legally obtained, that proceeding was abandoned and the one instituted which is now before us.   The present proceeding is based, as is shown by the affidavits and papers, upon the value of the property as ascertained by the assessment-roll of 1884, and upon the ownership of such property appearing in the last named assessment-roll, for the purpose of notices to be given under section 5 of the act.   The affidavits previously used were resworn and thus made new affidavits for the purposes of this application ; and if their statements are true, there can be no question but that they relate to the assessment-roll last confirmed and completed.

This application is based upon an alleged refusal of the owners of one-half in value of the property bounded on the road, to give their consent to the construction of the road.   The affidavits show that of the owners representing on the assessment-roll three-quarters in value have refused to give their consent.   This is stated in general terms, and it is also sworn to that the owners of more than one-half of the actual or market value of the property, independently of its assessed value on the roll, have refused to give such consent.   The names of all the owners, agents and representatives, as they appear

on the assessment-roll, are set forth.   The efforts made to obtain their consent are detailed.   This is done for the purpose of showing that the statement of such refusal is not the mere conclusion of the affiants, but the fair result of the facts as detailed in the affidavits.   And taking these several statements together there can be no reason to doubt that the fact is established by the affidavits that more than one-half the owners in value along the line of the proposed railroad have refused their consent to its construction.   It is no matter what their reasons for the refusal are.   Whether they are good, bad or indifferent is wholly unimportant.   It is enough to establish, in order to satisfy the act, that the consent of the property owners, required by any of its provisions, " *cannot be obtained.*"   The reasons why it cannot be obtained may be extremely various in such a case.   Inability to find the owner, his absence from the country so that an application cannot be made to him, his infancy or insanity or other disability are as proper to be considered as his actual refusal.   The statute requires a fair and reasonable effort to be made to obtain the consent of more than half in value of the property owners.   But when more than one-half have refused to give consent, or whenever it is established that such consent cannot be obtained by reason of refusal or other controlling circumstances, then the provision which allows, under the Constitution, an application to a court for the appointment of commissioners becomes operative.   We have carefully scrutinized the affidavits accompanying the petition in this case, and are satisfied that they do present abundant evidence that the consent of more than one-half in value of the property owners along the line of Broadway cannot be obtained.

It is also objected that notice of this application has not been given, as required by the fifth section of the act.   That section authorizes personal service of the notice, or service by mail in the manner particularly indicated; and the notice required is to be served either personally, by delivering the same to the property owner, " or his agent or representative, as such owner, agent or representative appears upon such assessment-roll,"   *   *   *   " or by mailing the same, properly folded and directed, to such owner, agent or representative, at the post-office nearest his usual place of residence, with the postage paid thereon, at least ten days prior to

such application." It then provides that if the person on whom such service is to be made is unknown, or his residence is unknown and cannot by reasonable diligence be ascertained, no service of such notice, either personally or by mail, need be made. The affidavits before us show that these provisions have been carefully complied with, that the service has been by mail, directed to the owners, agents or representatives, as they appear upon the assessment-roll, in each instance, with postage paid, and that in many instances several notices have been directed to different addresses of the same person for the purpose of securing his attention. We are not able to see any fatal defect in respect of the service.

Affidavits are presented in opposition to the petition, which show that a very considerable portion of the property along Broadway is occupied by tenants, under leases of greater or shorter duration, to whom notices have not been directed. But none of these affidavits show that the names of those tenants appear on the assessment-roll as occupants or owners, nor is their interest in any case shown to be assessed on such roll for the purposes of taxation. Nor is it made to appear that any tenant or lessee whose name does appear on such assessment-roll has not been duly served. On the contrary, it appears affirmatively that all such have been served. The statute does not therefore require that occupants and lessees whose names are not on the assessment-rolls shall be served. They are regarded by the statute as represented by the persons assessed upon the roll for the full valuation of the property which, of course, includes their interests, and for that reason their interest, in the contemplation of the statute, is represented in and by the assessed ownership. We think that this objection is therefore not well taken.

Various constitutional questions have been raised and presented for our consideration. Some of them, it must be conceded, are of a nature that deserve consideration at the hands of the court. But they are of a character which may as well or better be presented, in our judgment, on the motion for confirmation of a report, if one favorable to the construction of the railroad shall be presented by the commissioners. Nothing is lost in their value by postponing them until that time, and we think that is the more judicious course.

Our consideration, therefore, leads us to the conclusion that upon the papers presented it is our duty, under the requirements of the

act, to proceed and appoint commissioners, without prejudice, however, to any of the constitutional questions just referred to.

BRADY, J.:

I concur in the views expressed by the presiding justice and therefore dissent from those embraced in the opinion of Justice DANIELS. I do not consider it necessary to add anything to what he has written upon the questions discussed. My object in writing at all is to state the reasons why we think the objections presented against Commissioners Vance and Lord should not prevent us from naming them in this new proceeding. Mr. Lord has no interest in any property on Broadway. His father has and this fact has doubtless led to the impression that he was not a disinterested person. Mr. Vance, it appears, is a stockholder in the corporation known as Mitchell, Vance & Co., which has a lease of premises on Broadway. He has no other interest affecting his qualification as a commissioner, the other assumed interests urged as objections having been completely answered and refuted. His interest as a stockholder does not disqualify him. If the commissioners, of whom he is one, think the road should be constructed they will so report to this court; and whether that report be adopted or not can now only be a matter of conjecture. We held in *The People* v. *John Kelly, etc.* (not yet reported), that Commissioner Kelly was not disqualified from adjudicating upon the validity of an assessment, although the decision might avail him if he interposed a claim which would, in effect, be determined by such adjudication. The statement of Justice STRONG was quoted in the opinion delivered, that judges must often and necessarily consider and decide questions which may be applicable to their own rights or to their property, should they be so fortunate as to possess any; thus the judges in this district have an extensive interest in the pecuniary affairs of the city, yet they frequently decide cases of considerable magnitude in which the corporation is a party. It may be added that the people of this city, residents and non-residents, who are occupants of stores, etc., are interested in the contemplated road, and it would be impossible to find one who can be said to be wholly disinterested within the broad application of that word. Mr. Vance is a stockholder in a company having a lease of

premises on Broadway.    This, as already stated, is the extent of his interest, and it is too remote to constitute a disqualification on the ground that he is not disinterested in the sense in which that word is employed in the statute.    The statute evidently contemplates a direct and legal interest to disqualify the person who may be selected.

It may also be said that the services, already performed by the commissioners in the former proceeding, will facilitate the proceedings herein, and will be of advantage to all parties advocating and contesting the proposed authority to build the road.    These services were rendered doubtless at great inconvenience, if not detriment, to their own affairs, and fairly and impartially for aught that appears, and we should regard the rejection of their names as commissioners, without more impressive reasons than those discussed, as decidedly invidious.

DANIELS, J. (dissenting) :

The applicant is a railroad company organized under chapter 252 of the Laws of 1884, to construct, maintain and operate a railway, commencing at the southerly end of Broadway, near the Battery, and extending, with double tracks, along Broadway to Union Square, and then to a point at or near the intersection of Fifteenth street with Union Square, and there connecting with another railway extending through Union Square, Broadway and Seventh avenue to Fifty-ninth street, at the Central Park.

Before the railway can be legally constructed, both the Constitution of the State, and the act under which the company has been incorporated, require that it shall obtain the consent of the owners of one-half in value of the property bounded on, and the consent also of the local authorities having the control of, any portion of the street or highway upon which it is proposed to construct and operate the railroad.    (Art. 3, § 18 of the Constitution ; sec. 3 of chap. 252, Laws of 1884.)    If the assent of so many of the owners cannot be obtained in the form prescribed for that purpose, then the determination of three commissioners, to be appointed by the General Term of the Supreme Court in the district in which it is proposed to construct the railway, confirmed by the court, may be taken in lieu of the consent of the property owners.

In support of the application affidavits have been produced upon which it has been claimed, on behalf of the railroad company, that it has been unable to obtain the consent of the owners of one-half in value of the property bounded on the street in which it is proposed to lay the railway.    It need not now be determined whether this position has been satisfactorily maintained by these affidavits, for, by the affidavits produced by way of answer to the application, it has been made to appear that the requisite consent of the local authorities has not been obtained.    The Constitution is silent as to the order in which the consent of the owners of the property, and that of the local authorities, shall be obtained.    It contains nothing either expressly or by implication requiring one to precede the other, and that was accordingly a subject within the province of the legislature.    By the enactment of a law, as it was required that one should be enacted to carry these provisions of the Constitution into effect, the legislature was at liberty to direct that either of the consents should precede the other, and whether that of the local authorities should be first obtained before an application should be made to the General Term, upon the alleged inability of the company to secure the consent of the requisite number of property owners was a matter addressed to it, and legislative action determining it would, in no respect, be in conflict with the provisions of the Constitution.    It was, therefore, within the province of the legislature to pass the act it was empowered to enact, in the form considered by that body to be best adapted to the object intended to be secured.    And as no railway could be laid or maintained without the consent of the local authorities, there was manifest propriety in requiring that it should be obtained, before the other proceedings were taken, to permit and authorize the construction of a railroad.    It was clearly fundamental upon which the other proceedings were naturally and logically dependent, for ineffectual efforts to obtain the consent of the property owners, followed by the appointment of commissioners by the General Term and the confirmation of their favorable determination, would be of no service or consequence whatever until the consent of the local authorities should also be obtained.    That has been made the basis of all that should be done to comply with these provisions of the Constitution, and the legislature appear to have followed that view

in the enactment of the law under which this company has been incorporated.    It is true that the act has not, in any positive terms, directed that the consent of the local authorities shall precede the other proceedings, but it has made use of language in the enactment of the law unmistakably disclosing that to have been the design and intention of the legislature.    With that design in view it has been enacted by the fourth section of the act that " the value of the property so bounded shall be ascertained and determined from the assessment-roll of the city or town in which such property is confirmed or completed, *last* before the local authorities shall have given their consent."    This direction cannot be complied with unless the assent of the local authorities shall be obtained before the effort is made to secure that of the property owners, for it can in no manner be known or determined by what assessment-roll the value shall be ascertained until after the consent of the local authorities shall have been given.    The phraseology of this portion of the section has been so framed as to refer to the consent of the local authorities, as a fact preceding the application to the property owners for their consent.    Its language is that the value shall be ascertained and determined from the assessment-roll, confirmed or completed last before the local authorities shall have given their consent.    The language plainly refers to the consent of the authorities as a precedent and accomplished fact, and it is upon the basis of that fact that the particular assessment-roll is to be ascertained, by means of which the valuations of the property can be determined.    In other words, there can be no assessment-roll selected as the criterion of valuation until after the consent of the local authorities has been given; for until that consent has been secured what the last assessment-roll confirmed or completed may be, before the consent of the local authorities shall be given, cannot be determined.    That the local authorities may afterwards give their assent is no answer to this construction of this portion of the act.    That is not what the legislature have prescribed.    But what they have provided for is that the consent of the local authorities shall first be obtained, and then by the assessment-roll last confirmed or completed before that, the company shall proceed according to, and follow, its valuations, to obtain the consent of a majority of the property owners upon the street.    And if the efforts for that purpose prove to be unsuccessful

when that shall be ascertained to be the fact, the application for the appointment of commissioners may be made to the Supreme Court• The act plainly contemplates a distinct and divisable order of proceeding. The first is to secure the consent of the local authorities. If that cannot be obtained then all other proceedings having in view the construction of the railway will be useless. But if that shall ·e obtained, then the second step in the proceeding is the endeavor to obtain the consent of a majority of the property owners, and as a criterion by which that proceeding is to be made effectual or ineffectual, the assessment-roll last confirmed or completed before the assent of the local authorities shall be given is to be acted upon and followed to ascertain the valuation of the property. If according to that assessment-roll a majority in value of the property owners consent, then the right arises to construct and maintain the road. If according to that measure of valuation a majority of the property owners withhold their consent, then the third step in the proceeding is authorized, and that has been made dependent on the inability to obtain the consent of the requisite number of property owners. It is necessarily also made dependent on the fact that the consent of the local authorities has previously been obtained. When that may appear to be the case and the property holders shall withhold their consent, the confirmation of the determination of the commissioners to be appointed by the court will complete the right of the railway company to construct its road. But without the preceding consent of the local authorities the determination of the commissioners and its approval by the court would pass for nothing.

That it was intended that the consent of the local authorities should precede the proceedings to be taken, to obtain that of the owners of the property, is further confirmed by a preceding clause of the same section, by which it has been declared that " any consent so given by said local authorities shall cease and determine at the expiration of one year thereafter, unless prior to the expiration of such period, the company obtaining such consent shall have filed the consent of the requisite amount in value of property owners, or the determination of commissioners confirmed by the court as herein provided." This clause of the section discloses the same design. For it proceeds upon the assumption that either the consent of the property owners, or that of the commissioners confirmed by

the General Term, shall follow the consent given by the local authorities.

It is no answer to these portions of the act that the assent of the property owners, or the confirmation of the report of the commissioners, can be of no service to the railway company until that also of the local authorities shall have been obtained. For the legislature did not proceed in the enactment of the law upon that theory. As the Constitution was silent as to the course of the proceeding, except that commissioners could not be appointed until after an ineffectual attempt was made to obtain the consent of the owners of the property, it might have done so and have postponed the consent of the local authorities until after the other proceedings had been taken. But it did not adopt that course. It proceeded upon the fact that without the consent of the local authorities no effectual proceedings for the construction of the railroad could be taken, and in the order of events that consent was required to be obtained before the company could intelligently proceed in its efforts to obtain the consent of the property owners. Without the consent of the local authorities the last preceding assessment-roll could neither be known nor ascertained, and, consequently, it could not be determined, as the act has required that to be done, that the majority of owners in value, appearing upon the roll, either gave or withheld their consent to the construction of the road. But after obtaining the consent of the local authorities, then the assessment-roll, upon the basis of which the value should be ascertained, would at once become apparent, and the next step in the proceeding could be intelligently taken to obtain the consent of the majority of the owners in value, as that valuation should be fixed by the roll, or the inability to obtain the consent should in like manner be made to appear. The legislature have so framed the law, and its provisions require to be observed before commissioners can regularly be appointed to determine whether the railroad should or should not be constructed.

The local authorities whose consent is required to be obtained in the first instance are the common council of the city, and that consent, when formally given, is subject to the veto power of the mayor of the city. (Chap. 252, Laws 1884, § 3.) It has been stated in support of the proceeding that the common council of the city

yielded its consent by a resolution adopted on the 30th of August, 1884. But this resolution was not adopted at a regular meeting of the council. The meeting adopting it was a special one, called by the united authority of eighteen out of the twenty-two members of the common council. This meeting convened at nine o'clock in the forenoon of the day on which the resolution was adopted, and from the evidence of the clerk, which was taken in the action of *Knox* v. *Kirk*, and has been authenticated by one of the affidavits produced upon the hearing, as that has been published in the City Record, it was made to appear that he was directed to give notice of the meeting to the absent aldermen about fifteen minutes before that time. And the fact is disclosed by his examination that the notice was not served upon the absent members of the common council. The failure to serve this notice rendered the meeting an unlawful one, and deprived it of all power and authority over this subject. If the absent members had been notified and, in compliance with the notice, had been present, they might have suggested very convincing reasons why the resolution should not be adopted, and the public were entitled to their presence, or the service of notice upon them for such a convenient time previously as would have procured their attendance to secure even the possibility of that advantage. Upon this subject, it has been said, that if the meeting be a special one, the general rule is, unless modified by the charter or statute, that notice is necessary and must be personally served, if practicable, upon every member entitled to be present, so that each one may be afforded an opportunity to participate and vote. (Dillon's Municipal Corps. [3d ed], § 286.)

The same point was considered in *People* v. *Batchelor* (22 N. Y., 128). And, in considering it, it was said in the prevailing opinion of the court that "it is, of course, indispensable for the appellants to show that all the members of the appointing body had notice of some sort, either actual or presumptive, of the time fixed for making the appointments. It would be absurd to hold that a portion only of those to whom a power of appointment is confided can get together and exercise the power without notice to their associates. It is not only a plain dictate of reason, but a general rule of law, that no power or function entrusted to a body consisting of a number of persons can be legally exercised without notice to all the members

composing such body." (Id., 134.) And because notice was not in that particular instance given, the appointment then in controversy was held to be without authority. The same principle applies directly to the exercise of any authority vested in the common council, upon whatever subject it may propose to act at a special meeting, as the meeting was at which this resolution was adopted. The law requires that the absent members shall have notice that the meeting is to convene before even the majority in attendance have legal power to act. This rule was not complied with in this instance. The absent members were neither notified, nor was any attempt made to serve notice upon them, of the meeting of the common council at which the resolution was adopted. And because of that omission it was without legal authority, and did not constitute the consent of the local authorities within the provisions of the act of 1884, or of the Constitution of the State.

After this resolution was adopted the legality of this proceeding was referred by the mayor to the corporation counsel, and the authorities bearing upon it were thoroughly and fully examined, and the same conclusion is shown to have been well sustained by them which has been already mentioned. The opinion of the corporation counsel upon this subject renders any further consideration of it unnecessary, for by all the authorities cited and referred to by him the settled rule of law is shown to be that to which reference has now been made. The opinion given by him may well be adopted for the government of the court in this proceeding as a clear, thorough and intelligent exposition of the law.

The resolution adopted by the members of the council in attendance was a nullity. It was wholly devoid of legal authority. For that reason the company has not obtained the consent of the local authorities for the construction of this railroad. Until that shall be done an application for the appointment of commissioners is premature, even though the property owners may have in fact refused their consent. For it cannot be determined that a majority in value appearing upon the assessment-roll, completed last before the local authorities shall have given their consent, have withheld their assent. And as that cannot be made to appear, the motion for the appointment of commissioners must necessarily be denied. If the act could be so construed as to allow the consent of the local

authorities to be obtained in future, it would not avoid a fundamental defect in the proceedings, for since the owners of the property are alleged to have refused their consent another assessment-roll has been completed and confirmed. That is now the last assessment-roll; and if the consent of the local authorities shall be obtained before another assessment-roll shall be made and completed, that will be the last assessment-roll mentioned in the law. And one-half in value of the owners of property, according to that roll, have not been shown to have been applied to for their consent. But the application for the owners' consent was according to the valuations appearing by the assessment-roll of the year 1883, and that by no possibility can be the roll confirmed or completed next before the obtaining of the consent, which has not yet been given, of the local authorities. This defect may be removed by proof showing the fact that the valuations and owners remain the same as they appear by the assessment-roll of 1884. But until that, as well as the other omissions to comply with the law, have been supplied, commissioners should not and cannot be lawfully appointed.

Motion for the appointment of commissioners granted, and same persons designated as commissioners as former commission.