THE PEOPLE OF THE STATE OF NEW YORK, Respondents, v. CHARLES C. PINCKNEY, JAMES W. BOOTH, MARTIN B. BROWN and PHILIP W. ENGS, Appellants.

| 32 | 377 |
| 165 | 528 |
| 32 | 377 |
| 170 | ³190 |
| 32 | 377 |
| j172 | 435 |

The act of March 30, 1865, entitled "An act to create a Metropolitan Fire District, and to establish a Fire Department therein," is constitutional and valid.

The offices created by said act are *new* and *public;* and the legislature, under the Constitution, is left free to provide for the election or appointment of the officers therein named.

The foremen, engineers and other officers of the Fire Department of New York were not, in 1846, officers in the sense of the Constitution. (Art. 10, § 2.) Therefore, the legislature could, in their discretion, direct the mode of their appointment.

The firemen in cities and villages, and their various grades of officials, are not to be regarded as civil and public officers, within such provision of the Constitution.

The legislature may, at its discretion, recall to itself and exercise so much of the powers it has conferred upon municipal corporations as are not secured to such corporation by the Constitution.

The corporation of a city is not an officer within the meaning of such article. (Art. 10, § 2.)

ACTION in the nature of *quo warranto*, brought to test the title of the defendants to the office of "metropolitan fire commissioners," to which office they were appointed by the governor, by and with the advice and consent of the senate, under the act entitled "An act to create a Metropolitan Fire District, and establish a Fire Department therein," passed March 30, 1865.

The complaint alleges that at the time of the passage of the act referred to, the "Fire Department of the city of New York" was and still is a body corporate by and under the laws of the State, and that the offices of "president, vice-president, secretary, treasurer, representatives, fire commissioners, commissioners of appeal, chief engineer and assistant engineers, with other offices," were and still are "offices thereof and public offices," and that the office of president of the *fire department* was and is held by John R. Platt, and that the office of *chief engineer* thereof was and is held

by John Decker, and that the remainder of the offices of the *fire department* were and still are exercised each by persons respectively holding the same.

The said complaint then alleges that the defendants, without legal warrant, had usurped, intruded into, and unlawfully held and exercised *the said offices* as metropolitan fire commissioners under the said act, and prays judgment of ouster.

The answer admits the existence of the Fire Department of the city of New York at the time of the passage of this act ·as a body corporate, and that the *offices mentioned were offices therein* and held by the persons mentioned, but denies that they were public officers, &c.

The answer alleges the title of the defendants by appointment under the act, and that they have taken the oath of office as "metropolitan fire commissioners," and entered upon the duties of said office, and are entitled to hold the same, and denies the other allegations.

Upon the trial before Judge FOSTER, the defendants proved their appointment, and that they had taken the oath of office, and entered upon their duties as alleged, and these facts being found as alleged, judgment passed for the defendants.

Upon appeal to the General Term of the Supreme Court, this judgment was reversed and judgment absolute given for the plaintiffs, with costs. The defendants have. appealed to this court.

*Waldo Hutchins & William F. Allen*, for the appellants.

I. The judgment of the General Term can be sustained only upon the ground that the act of March 30, 1865, establishing a Metropolitan Fire District, is void as being in conflict with the Constitution of 1846. (Art. 10, § 2.)

In asserting the unconstitutionality of any statute, the *onus* is upon the party asserting it, for the court will presume every act of the legislature constitutional; and before an act will be declared unconstitutional, a case must be presented free from every reasonable doubt. (See *Fletcher* v. *Peck*, 6 Cranch, 87, per MARSHALL, Ch. J.; *Ex parte McCollum*, 1 Cow., 550; *Newell* v. *The People*, 3 Seld., 109.)

II. The restrictions imposed by the Constitution relate only to county, city, town and village offices existing at the time the Constitution took effect. (*People* v. *Draper*, 15 N. Y., 532.)

III. The allegations of the complaint and the admissions of the answer do not bring the case within the restrictions of the Constitution; that is, the office of Metropolitan Fire Commissioners, under the act of 1865, does not fall within either of the classes whose election is referred to the electors or local authorities.

The office of fire commissioner, as a public civil office, had no existence in 1846, and was created by the act of 1865.

The offices and officers mentioned in the complaint, and alleged to have been *in esse* at the passage of the act of 1865, were neither city, county, town or village offices or officers. They were only offices or officers of a private corporation.

The Fire Department of the city of New York had no connection with the extinguishment or prevention of fires within the city; and, at most, it could only be *an agency* for such object; it could not be a public officer.

The legislature have power to create *new offices*, and to provide for the appointment of officers thereto.

An office which combines and unites the powers and duties of several, or which confers upon one or more officials, functions and powers before exercised by different agencies, employed by different branches of the government, is a *new* office. The legislature have a right to say when any given public agency shall be changed.

The Metropolitan Fire Commissioners are, by the act of 1865, charged with substantial duties, and vested with substantial powers, never before devolved upon, or exercised by, any public civil officer.

*John Cochrane*, Attorney-General, for the respondents.

The offices of the " Metropolitan Fire Department " named in the law of March 30, 1865, are the offices of the Fire Department of the city of New York which existed in 1846, and previously, without substantial or material modification,

and are, therefore, New York city officers existing before the present State Constitution went into effect. The Metropolitan Fire Department described in the law of 1865 is limited, territorially, to the city of New York. The Metropolitan Fire Commissioners constitute such Fire Department so limited to the city of New York, and, therefore, they are officers of New York, and should be elected by its constituency or appointed by its authority. (Const. 1846, art. 10, § 2.)

The law of 1865, conferring the appointment of the Metropolitan Fire Commissioners on the governor of the State, is, therefore, unconstitutional in all its parts.

I. The offices of the Fire Department of the city of New York are offices of the city of New York, and these offices are those contemplated and named in article 10, section 2 of the Constitution of 1846. (Authorities cited.)

II. The offices of the Metropolitan Fire Department named in the law of 1865 are the same offices which existed in the city of New York before the adoption of the present State Constitution. (Authorities cited.)

III. The Metropolitan Fire Department named in the act of 1865 is, by the terms of the act, constituted and formed of and by the Metropolitan Fire Commissioners therein named, and both the commissioners and the department are limited to the city of New York.

Davis, J. The appeal in this case brings to this court for consideration the question of the constitutional validity of the act of the legislature, entitled "An act to create a Metropolitan Fire District,and establish a Fire Department therein," passed March 30, 1865. Other questions of minor importance and technical in their character are presented; but the gravity of the principal controversy should prevent their having any weight in the decision of the case.

The constitutional questions arise under the second section of article ten of the Constitution of this State, adopted in 1846. That section is in these words: "All county officers, whose election or appointment is not provided for by this Constitution, shall be elected by the electors of the respective

counties, or appointed by the board of supervisors or other county authorities, as the legislature shall direct. All city, town and village officers whose election or appointment is not provided for by this Constitution, shall be elected by the electors of such cities, towns or villages, or of some division thereof, or appointed by such authorities thereof as the legislature shall designate for that purpose. All other officers whose election or appointment is not provided for by this Constitution, and all officers whose offices shall hereafter be created by law, shall be elected by the people or appointed as the legislature may direct."

This section has already been the subject of judicial construction by this court in *The People* v. *Draper* (15 N. Y., 532), where it received in the leading opinion a complete, perspicuous and convincing examination. It is settled by that case, that the officers and offices designated or intended in the first two sentences of the section, are those "instituted and existing under actual laws of the State" at the time of the adoption of the Constitution; and that those embraced in the last clause are "all officers of every description, both local and general, *whose offices were to be thereafter created by law.*" "It will be perceived," said DENIO, J., "that four classes of officers are referred to in the section: First, those whose election or appointment is provided for by the Constitution; these are named only to be excluded from the direction given. Second. Existing local officers, the then present county, city, town and village officers; these are to be chosen by constituencies in their respective localities. Third. All existing offices whose election, &c., is not provided for by this Constitution, and who are other than county, city, town and village officers; and, Fourth. All officers of every description, both local and general, whose offices were thereafter created by law. The two last classes are thrown into one, and the legislature is left free to provide for their election or appointment as it shall think most suitable.

The *People* v. *Draper* settles also two other propositions, upon the application of which to this case, its determination depends: First. That the city, town or county *office* to which

the legislature may direct the appointment under the fourth clause, must be created subsequent to the Constitution; and *not the officer merely;* or in other words, that "it is not enough to take the case out of the provisions of this section, that the names of offices existing when the Constitution was adopted, are afterwards changed by an act of the legislature, or that their functions are colorably modified." Second. That it is within the constitutional power of the legislature to create new civil divisions or districts of the State, for general and permanent purposes of civil government, which recognize, and do not abolish the established divisions into counties, towns and cities; and to appoint officers of the district thus organized, whether the offices, whose functions they are to discharge, were created before or since the Constitution.

With these landmarks to guide us, we approach the consideration of the case before us.

It presents two propositions: First. Are the commissioners whose appointment is directed by the act, officers of a new civil division or district of the State within the meaning of the rule laid down by this court in the *People* v. *Draper?* Second. If not such officers, are the offices to which they are appointed, newly created, either in respect to their general and substantial functions, or because those functions were not previously discharged by persons who were public officers when the Constitution was adopted, within the meaning of that instrument?

Under the first of these propositions, it is manifest that the officer to be appointed, to be within the power reserved to the legislature, must be an officer of the new district or division, and not merely local in the scope and performance of his duties and functions, and therein superseding some existing local officer. He must be a district officer in the sense of his functions and authority, and not merely in name, with no powers or duties beyond a previously organized ocality. It would not be competent, therefore, for the legislature to create a new civil division of the State, and abrogate the local offices of the several counties that might compose

it, and direct the appointment by the governor and senate of other officers limited to perform the same local functions only, although distinguished by new and more extended titles. If that were so, the central power could draw to itself the appointment of all local officers not expressly provided for by the Constitution itself.

It is, therefore, essential, in order to justify their appointment by the governor and senate, on this ground, that the defendants should be, under the act, officers of a new civil division or district of the State, created for general permanent purposes of government in substance and fact, as well as in name.

By the first section of the act under consideration the cities of New York and Brooklyn are "united into a district to be known as the Metropolitan Fire District of the State of New York." The second section directs the governor, by and with the consent of the senate, to appoint four citizens, residents of said district, to be "Metropolitan fire commissioners," which office is declared to be thereby created, with the duties and powers in the act contained and imposed, and who shall form a "Metropolitan Fire Department." The commissioners, having qualified as prescribed by the third section of the act, are directed by section four to meet and organize the Metropolitan Fire Department by electing one of their number to be their president, and appointing a person to be secretary. The functions and duties of the "Metropolitan Fire Department," thus created, are in all respects territorially local, and confined to the city of New York. It is in vain to search the act for any authority given to the department beyond the limits of that city; and the city of Brooklyn is as much outside of their control and authority as any other city of the State. To the body or board thus created no power whatever which relates, either in its extent or exercise, to the fire district created by the first section of the act, is given; but every power is limited to a single locality of the district. The existing fire departments of the city of Brooklyn are left, as to their management, organization and powers, in full vigor, subject to no interference, dictation, or control

of the metropolitan department created by the act. Nor are these facts the less true because the chief engineers of the city of Brooklyn are required to make an annual report to the commissioners created under this act, of the several matters mentioned in the twenty-third section; nor because the twenty-fifth section authorizes the commissioners " to request, in writing," those engineers to assist the department in New York with officers, men and apparatus when it needs their aid, and makes it the duty of the engineers to send the desired assistance. The making of the required report to the commissioners gives them no more official power over the fire departments of Brooklyn than the same fact would give the Secretary of State if the report was required to be made to him or filed in his office. As to the authority to ask for help in time of need, a similar power is given to each of the chief engineers in Brooklyn, and a like duty is imposed on the department of New York; and the most that can justly be said of it is, that a matter of comity between the cities is legalized to a mutual duty, and each party is authorized to pay for the favors it receives.

Conceding that a " Metropolitan Fire District" is created by the act, composed of the cities of New York and Brooklyn, it cannot be doubted but that the officers created under it are limited in their authority and functions to the city of New York alone. They are not, therefore, district officers in any just sense of those terms, whatever they may be called. And in my judgment their appointment by the governor and senate is not, and cannot be, justified on the grounds that enabled this court to uphold the organization and appointments of the metropolitan police bill.

This leads us to consider the question whether the offices created by the act are new in respect to their operative and substantial functions; or, in a sense, that those functions were not, at the time of the adoption of the Constitution, performed by persons who were officers under some name, within the meaning of that term. as used in the second section of article 10. The words " officers " and " offices," as used in that section, had a well defined legal signification.

They were used, undoubtedly, with reference to that mean
ing, and in no loose or general sense.

The statutes of the State had defined and classified, with
great precision, the public or civil officers.   For the most
part they, with the exception of town officers, were arranged
in classes, and denominated legislative, executive, judicial
and administrative (1 R. S., ch. 5, p. 95); and the several
town officers were designated with equal distinctness.  Upon
all these, with few exceptions, the Constitution or the
statutes imposed the obligation of the oath prescribed by
the Constitution, under the sanctions of which the duties
of the office were to be performed. (Constitution of 1821,
art. 6 ; 1 R. S., 119, 120, 345.)

But article 10 of the Constitution itself does not leave us
in any doubt as to the sense in which these words were used.
The third section declares that " when the duration of any
office is not provided by this Constitution, it may be declared
by law," &c.

§ 4. That " the time of *electing all officers named in this
article* shall be prescribed by law."

§ 5. That the legislature shall provide for filling vacancies
in office, and, in case of elective offices, that no person shall
hold, by virtue of his appointment to fill a vacancy, longer
than the commencement of the political year next succeed-
ing the first annual election after the happening of the
vacancy.

§ 6. That the political year shall commence on the first
day of January.

§ 8. That the legislature may declare the cases in which
any office shall be deemed vacant where no provision is made
for that purpose in the Constitution.   No one can attentively
read these several provisions, without seeing that the words
" officer " and " offices " were used in a strict conventional
sense, meaning those which were " public and civil," in the
sense in which those terms are used in the Constitution and
statutes of the State.

The metropolitan fire commissioners, created by the act
of 1865, constituted a board or department of large and very

general powers within their local jurisdiction. The act has gathered into their grasp a variety of functions, powers and duties heretofore exercised by a number of other persons. It has made them officers, and thrown around their powers the sanctions of public and civil office. New officers are, therefore, unquestionably created; and it remains to be seen whether a new office has not also been created, so that the legislature could direct the manner in which it should be filled. The fact that the functions and powers that are now centered in an office, have previously in some form, been used to the benefit and advantage of the public, is not the test to which this question is to be brought. Under such a test, it would be difficult to conceive a case where a new office could be made, for it taxes ingenuity to imagine duties or functions of public interest that have not in some form been exercised by some class of existing officers or persons.

The test, therefore, must be whether the functions conferred are substantially new in the sense that they were not exercised by public civil officers at the time the Constitution was adopted.

The powers conferred on the new department are sufficiently expressed in the following sections of the act to raise fully the questions before us.

"§ 4. Said commissioners, on being qualified, shall meet and organize "The Metropolitan Fire Department," by electing one of said commissioners to be president, and appointing a person to be secretary. Whereupon they shall possess and have all the power and authority conferred upon or possessed by any and all officers of the fire department of the city of New York, and to the exclusion of all such officers, and such other powers and duties in said district as are hereinafter conferred. Three of said commissioners shall constitute a quorum for the transaction of business, but the surviving members may, at any time, fill a vacancy, as provided in the second section of this act.

§ 5. The said "Metropolitan Fire Department" is hereby empowered and directed to possess and exercise fully and

exclusively all the powers, and to perform all the duties, for the government, management, maintenance and direction of the fire department of the city of New York, and the premises and property thereof, which, at the time of the organization of said department, were possessed by or under the control of the boards and officers of the fire department of said city, or the officers or employees of said city; said powers and duties to be exercised and performed, and said property used, in the said city or otherwise, as hereinafter provided. And the said department shall hereafter have sole and exclusive power and authority to extinguish fires in said city of New York; and all acts conferring upon any other officer and officers any power in relation to the extinguishment of fires in said city, are hereby repealed.

§ 6. The board of commissioners shall have full power to provide, in and for the city of New York, supplies, horses, tools, implements, and apparatus of any and all kinds (to be used in the extinguishing of fires), and fire telegraphs, to provide suitable locations for the same, and to buy, sell, construct, repair and have the care of the same and take any and all such action in the premises as may be reasonably necessary and proper.

§ 7. The department hereby created is hereby empowered and directed to possess and exercise full and exclusive power and discretion for the government, management, maintenance and direction of the several buildings, and premises, and property, and appurtenances thereto, and all apparatus, hose, implements, and tools of any and all kinds, which, at the time of the appointment of the commissioners aforesaid, were under the charge and control of any and all city officers or officers of the fire department in said city, for the use and benefit of the fire department of the city of New York. And it shall be the duty of all persons and officers in possession of any property, real or personal, belonging to or set apart for or in use by or for the fire department of said city, to deliver the same to the possession and control of said "Metropolitan Fire Department."

The first inquiry, then, is, were the fire department of the city of New York, and the officers thereof, whose existence and functions, so far as they relate to public interests are

swallowed up in the Metropolitan Fire Department, *officers*
when the new Constitution of 1846 was adopted, within
the meaning of article 10 of that instrument. No gene-
ral statute has been brought to our notice, and none has
fallen under our observation, by which the fire department
or its officers were ever called or recognized as public or
civil officers. It is necessary, therefore, to examine the his-
tory of the department, to ascertain whether, in fact or law,
it is entitled to claim such relations to the public. But this
examination may be limited to the period antecedent to the
adoption of the Constitution, because what has since trans-
pired has no legal effect upon the question.

By an act of the legislature, passed March 29, 1798, the
firemen of the city of New York were incorporated by
the name of " The Fire Department of the city of New York,"
with the usual general powers of a corporation, to continue
until the first Tuesday of April, 1818. They were empow-
ered to choose representatives, who, out of their own number,
were authorized to choose a president and vice-president, and,
out of the whole body of the firemen, three trustees, and a
treasurer, secretary and collector. The representatives were
empowered to make by-laws, ordinances and regulations
touching the management and disposition of their funds,
the meetings of the corporation, the duties and conduct of the
officers and trustees, and " all such other matters as appertain
to the business, ends and purposes for which the said corpora-
tion is instituted, and for no other purpose whatsoever." The
funds of the corporation were directed to be appropriated to
the relief of indigent and disabled firemen and their families;
but if they should amount to a greater sum than the trustees
should think necessary to apply to those purposes, the repre-
sentatives were empowered to apply such surplus to the
purpose of extinguishing fires, under such limitations and
restrictions as they might, with the sanction of the corpora-
tion of the city of New York, deem proper. This incor-
poration was renewed by an act passed April 12, 1816, and
extended, without change of powers and privileges, to the
1st day of May, 1838. It was again renewed by an act

passed April 16, 1831, and extended to the 1st day of May, 1860, "unless sooner altered, modified or repealed by the legislature," and its authority to hold real and personal estate was increased to the sum of $50,000, which was enlarged to $100,000 by an act passed March 25, 1851; and again, by ch. 200 of the Laws of 1858, the charter was extended until the first day of May, 1880, "unless sooner altered, modified or repealed by the legislature."

It will be observed that the charter of this corporation has been at all times since 1838, at which time the renewal of 1831 took effect, expressly subject to be altered, modified or repealed by the legislature at its pleasure; and accordingly, in 1841, it was altered by making exempt firemen eligible to most of its offices. This corporation was thus in existence under its original charter, with few slight modifications, when the Constitution took effect. It was the representative of a public charity (3 E. D. Smith, 440), which was the chief object of its creation.

Neither the corporation itself nor the officers elected under the provisions of its charter, were at any time, by reason of any power derived through the charter, public or civil officers, within the meaning of the Constitution. The corporation was not a municipal or political body, and neither it nor its officers occupied any greater official relation to the public than the officers or managers of the numerous religious and charitable corporations of the State. And it cannot be doubted that in so far as the officers of the fire department derived their authority under the act of incorporation, they have been at all times since 1838, subject to the control of the legislature of the State. It was competent for the legislature to have repealed the charter at any moment, and that gone, what basis for official existence would be left to the persons holding the various offices under it? The corporators under this charter, prior to 1846, were "the engineers of the fire department, and firemen belonging to any of the fire engines of the city of New York." (Laws of 1798.) The firemen were selected under power conferred by various acts of the legislature, by "the mayor, aldermen and commonalty of the city of New York, in common council con-

vened," who were empowered to remove them at pleasure, and to "make rules and regulations in respect of the government and duty of the persons by them appointed firemen, in the working, managing and frequent exercising, trying and using of the fire engines, tools and other instruments," and in respect to their conduct and duty at fires. (Laws of 1813, ch. 86, §§ 74, 75, 76, 84; Laws of 1817, ch. 59, § 1.) By ordinances of the common council, the members of the fire department were more explicitly defined. The ordinance of May 5, 1817, declared that it should "consist of a chief engineer and as many other engineers, fire wardens, firemen, hosemen, hook and ladder men, as might from time to time be appointed by the common council, and who shall respectively be distinguished by the several appellations aforesaid." This ordinance, in respect to its designation of persons of whom the fire department should consist, was substantially repeated, by ordinances passed December 26, 1820, October 27, 1823, April 30, 1827, December 10, 1833, May 7, 1838, April 23, 1839, and June 22, 1842. The manner of their selection was substantially this: each company elected its own members and particular officers, whose names were thereupon sent to the common council for appointment. The common council, for a time, appointed the engineers and assistants, selecting them from the members of the fire department; afterward they were nominated to the common council by the engineers, and foremen and assistant foremen of the several companies, and finally they were nominated by general ballot of the members of the fire department, as prescribed by the ordinances of July 16, 1839, and June 22, 1842. They were, for most of the time, held at the pleasure of the common council, and finally, "until a new election shall be asked for by a majority of the firemen, shall be held and the nomination made by them duly confirmed."

In the performance of their duties, and in their general conduct as firemen, and in the care and management of the property and apparatus for extinguishing fires, they were subject to the regulations and ordinances of the common council. Did these facts have the effect to make them public and

civil officers within the provision of the Constitution? The object of their appointment—the extinguishment of fires—is one of great public importance, relating to the security of life and property in the city. But it was never thought to be necessary to accomplish it by the appointment of large bodies of public officers. Agencies or instrumentalities for that purpose were authorized and created in the form of companies of men, with foremen, assistant foremen, and various minor officers, who were subjected to other and higher agents, in the form of engineers and assistant engineers, all forming an organized body of men to accomplish by combination what they were individually unequal to perform. It would astonish a lifetime fireman of New York to be told that he had been all the while a public officer; and if the firemen were not themselves public officers, neither were the persons selected from themselves to superintend them in the performance of their labors and duties. Officers they were in respect to their relations to the subordinate members of the fire department, and in the sense in which that term is used to indicate that relation, but never in the civil and public sense in which it is used in the tenth article of the Constitution. This will more readily appear by reference once more to the article and some of its sections. The fourth section enjoins that "the time of electing all officers named in this article shall be prescribed by law." Surely, this cannot mean that the legislature shall prescribe the time for appointing firemen and engineers! The fifth section, that the legislature shall provide for filling vacancies in office. No one has dreamed of passing an act of the legislature to fill vacancies in the members of the fire department. Nor has any one deemed the provisions in relation to the termination of offices with the political year, had any application to this class of municipal agencies; nor, in short, have any of the duties enjoined upon the legislature by art. 10, touching the duration of offices, times of election, the filling of vacancies, and when the office shall be deemed vacant, ever been applied to the firemen and their officers in cities and villages. There has been a great dereliction of duty heretofore, on the part of the legislature, if these numerous

bodies of public officers were intended to be embraced in the provisions of that chapter. But the whole difficulty is easily solved and disposed of, by recurring to the fact, which may be said to have been universally accepted as true, that the firemen of our cities and villages, and their various officials of every grade, have never been regarded as civil and public officers.

In *The People* v. *Conover* (17 N. Y., 64), it was held that a mere agency of a municipal corporation is not an officer of the State; to be such the office must be directly created by the Constitution or by statute. I think, therefore, it may be safely asserted, that the foremen, engineers and other officers of the fire department of New York were not, in 1846, officers in the sense of the Constitution, so that the legislature could not direct the mode of their selection and appointment in its discretion. It had the power to have declared them public officers, had it chosen so to do, and thereby have created new officers independently of the city authorities, so far as the appointing power is concerned. So far as the act of 1865 transfers these powers and duties to the commissioners, it creates both *new officers* and *new offices*, for it changes functions heretofore performed by persons non-official in their relation to the public, into the duties of public and civil officers. As if the legislature should declare the presidencies of all insurance companies whose charters are under its control, to be public offices, to be filled by appointment of the governor and senate, without at all changing the duties of the position. The *office* would be new, though all its duties would be old, because private functions would be transmuted to public and official ones.

It is of no moment what official relations may have sprung up, since 1846, to govern the fire department of the city, nor whether any of them are public offices in their nature. Their places and powers, if any there be, are clearly subject to the authority of the legislature; because the constitutional inhibition applies only to offices existing at that time; and I, therefore, refrain from pursuing the history of the fire department since that period.

But it may be urged, from the fact that the corporation of

the city of New York were authorized to appoint the firemen and their officers, and legislate generally for their regulation, that the act of 1865, which gives those powers to the new department, is, for that reason, a violation of the Constitution. But those powers were no part of the official duties of individual officers composing the common council. They were given to "the mayor, aldermen and commonalty of the city in common council convened," and were part of their general corporate powers as an administrative and legislative body.

The power of the legislature of the State is supreme over that of all local legislatures, except when the Constitution intervenes to restrict it. The corporation of the city is not an officer within the meaning of the 10th article. To diminish or restrict its general legislative or administrative power as a body corporate, is not to abrogate or change a public office in the sense of the constitutional restriction. The legislature may recall to itself, and exercise at its pleasure, so much of the powers it has conferred upon the city corporation as are not secured to it by the Constitution. This necessarily results from the fact, that all the legislative power of the people, is granted to the legislature except such as is expressly reserved.

This point, I conceive, was necessarily disposed of by *The People* v. *Draper* (15 N. Y., 532). One question in that case was, whether the legislature could create the new civil division, and, taking from the common council of New York the appointment and control of the entire police of the city hitherto belonging to them, confer it upon new district officers appointed by the governor and senate. It was argued that this took away powers emanating from local constituencies, and that it was the intent of the Constitution to secure all existing local authority to its existing local sources — an object which was, of course, directly subverted, if new territorial divisions could be created, embracing existing localities in which the same powers were to be exclusively exercised under a central State authority. But to this position it was answered, "It may be said, that as mat-

ters of police have generally been of local cognizance, an act which shall unite for police purposes several counties and cities causes the local division to be less distinctly defined; and this is true. But this, if it proves anything, proves too much. ‘The argument would stamp the distribution of administrative authority among the local divisions, with the attribute of absolute permanency. Every change‧ in this respect would intensify or detract from the distinctness with which these divisions were marked when the Constitution was framed. Within our recollection, the arrangements for the support of the poor have been the subject of changes, which have taken from the county authority and given it to the towns, and the reverse. District attorneys were once appointed for several counties. Afterward one was appointed for each county. The same features are found in respect to common schools. In the administration of this system, both town and county agencies are employed, but changes are often made, by which power is taken from one and given to the other. If we were to establish the principle that the legislature can never reduce the administrative authority of counties, cities and towns; can never resume in favor of the central power any portion of the jurisdiction of those local divisions, or change the partition of it among them as it existed when the Constitution was adopted, we should, I think, make an impracticable government. It is the business of the legislature to adjust, in the interest of the whole people of the State, the distribution of the powers of government, taking care that no direct provision of the Constitution is violated, and that no arrangement which it has made is incidentally disturbed. * * We conclude that the act is constitutionally valid so far as this objection is concerned. (Per DENIO, J., p. 542.) In *The People* v. *Batchelor* (22 N. Y., 128), it was said by SELDEN, J.: "No one, I think, can doubt the power of the legislature to withdraw entirely or postpone the exercise of an authority conferred by itself alone upon the mayor and aldermen. No provision of the Constitution contains any restriction upon this power." In that case, the act withheld

for a time, the appointment of an officer whose appointment had been vested in the common council prior to 1846, and retained the incumbent in office during that period. "The legislature," said DENIO, J., in *Darlington* v. *The Mayor, &c.* (MSS. Op.), "have plenary power in respect to all subjects of civil government, which they are not prohibited from exercising by the Constitution of the United States, or by some provision or arrangement of the Constitution of the State." And he condenses, with approbation, the views expressed by Justice WASHINGTON, in *Woodward* v. *Dartmouth College* (4 Wheat., 518), "that there were two kinds of corporations aggregate, viz., such as were for public government, and others of a private character. The first are those for the government of towns and cities, or the like, and being for public advantage, are to be governed according to the laws of the land. That these were mere creatures of a public institution created exclusively for public advantage. That it would seem reasonable that such a corporation may be controlled, and its constitution altered and amended by the government in such manner as the public interest may require. That such legislative interference cannot be said to impair the charter by which the corporation was formed, because there is in reality but one party to it, the trustees or governors of the corporation being merely the trustees for the public, the *cestui que trust* of the corporation." (See Story Constitution, 1, 387; 2 Kent, 275.)

In the *People* v. *Morris* (13 Wend., 395), the late Supreme Court held, that political powers conferred upon a corporation for the local government of a place, are not vested rights as against the State, and may be abrogated by the legislature, as well by a general law affecting the whole State as by a special act altering the powers of the corporation. "It is an unsound and even absurd proposition," says NELSON, J., in an opinion of signal ability, "that political power conferred by the legislature can become a vested right as against the government, in an individual or body of men. It is repugnant to the genius of our institutions, and the spirit and meaning of the Constitution; for by that fundamental law,

all political rights not there defined and taken out of the exercise of legislative discretion, were intended to be left subject to its regulation." These remarks are equally applicable to the present Constitution. It would be impeaching the good sense of the convention to assume, that by the arrangements of the 10th article relating to local officers and their appointment, there was any design to keep or guard local powers in the administrative bodies or legislatures of municipal corporations. Such an intent would not have been couched in dubious language, nor left to blind inference. Both on authority and principle the power exists in the legislature to diminish, regulate or resume the powers it has conferred on all municipal corporations, unless interdicted by the Constitution itself.

To transfer to a new board a portion of the administrative functions of the common council is not obnoxious to any prohibition expressed or implied in the second section of the tenth article of the Constitution.

From these views it follows that the appointment of the defendants to the office of metropolitan fire commissioners was constitutionally valid, and they are entitled to judgment accordingly.

All the judges concurred except Brown, J., who delivered a dissenting opinion. The dissenting opinion of Brown, J., not being furnished in time for publication in its proper place, will be found at the end of this volume.