TILLEY *v.* SAVANNAH, FLORIDA & WESTERN R. Co. and others.

*(Circuit Court, S. D. Georgia.*   February 9, 1881.)

1. RAILROADS—FREIGHT AND TARIFF—DISCRIMINATION—LEGISLATIVE CONTROL—COMMISSION TO FIX RATES—CONSTITUTION OF GEORGIA— ACT OF GEORGIA, OCTOBER 14, 1879.

An act of the legislature of the state of Georgia, approved October 14, 1879, entitled " An act to provide for the regulation of railroad freight and passenger tariffs," etc., etc., forbade the railroad corporations of the state from charging unfair and unreasonable rates of freight and fare, or making unjust discriminations for the transportation of passengers and freights ; and provided for the appointment of a commission to prescribe reasonable and just rates of freight and passenger tariffs, to be observed by all the companies doing business in the state on the railroads thereof. *Held,* that such act was not in violation of either the constitution of the United States or of the State of Georgia ; and that the question whether the rates prescribed by the legislature, either directly or indirectly, were just and reasonable, was one which, under the constitution of the state, the legislature might determine for itself.—[ED.

In Equity.   Motion for Injunction *pendente lite.*

The constitution of the state of Georgia, paragraph 22, § 7, art. 3, reads as follows:  "The general assembly shall have power to make all laws and ordinances consistent with this constitution, and not repugnant to the constitution of the United States, which they shall deem necessary and proper to the welfare of the state."

Paragraph 1, § 2, art. 4, declares that "the power and authority of regulating railroad freights and passenger tariffs, preventing unjust discriminations, and requiring reasonable and just rates of freight and passenger tariffs, are hereby conferred upon the general assembly, whose duty it shall be to pass laws from time to time to regulate freight and passenger tariffs, to prohibit unjust discriminations on the various railroads of the state, and to prohibit said roads from charging other than just and reasonable rates, and enforce the same by adequate penalties."

Paragraph 2. "The exercise of the right of eminent domain shall never be abridged nor so construed as to prevent the general assembly from taking the property and fran-

chises of incorporated companies, and subjecting them to public use the same as property of individuals, and the exercise of the police power of the state shall never be abridged nor so construed as to permit corporations to conduct their business in such manner as to impinge the equal rights of individuals or the general well-being of the state."

Paragraph 1, § 5, art. 2, declares: "The people of this state have the inherent, sole, and exclusive right of regulating their internal goverment and the police thereof, and of altering and abolishing their constitution whenever it may be necessary to their safety and happiness."

Paragraph 1, § 3, art. 1, declares: "* * * Private property shall not be taken or damaged for public purposes without just and adequate compensation being first paid."

Paragraph 3, § 1, art. 1, declares: "No person shall be deprived of life, liberty, or property except by due process of law."

Paragraph 2, art. 1, § 1, declares: "Protection to person and property is the paramount duty of government, and shall be impartial and complete."

Paragraph 1, § 4, art. 1, declares: "Laws of a general nature shall have uniform operation throughout the state, and no special law shall be enacted in any case for which provision has been made by an existing general law. No general law affecting private rights shall be revised in any particular case by special legislation, except with the free consent in writing of all persons to be affected thereby."

Paragraph 23, § 1, art. 1, declares: "The legislative, judicial, and executive power shall forever remain separate and distinct, and no person discharging the duties of one shall at the same time exercise the functions of others except as herein provided."

Paragraph 3, § 3, art. 1, declares: "No grant of special privileges or immunities shall be revoked except in such manner as to work no injustice to corporators or creditors of the incorporation."

These provisions of the constitution being in force, the legislature, on October 14, 1879, passed an act to carry into

effect paragraph 1, § 2, art. 4, above quoted.  The act provides (section 3) as follows: "That  *  *  if any railroad corporation organized or doing business in this state under any act of incorporation or general law of this state now in force, or which may hereafter be enacted, or any railroad corporation organized, or which may hereafter be organized, under the laws of any other state, and doing business in this state, shall charge, collect, demand, or receive more than a fair and reasonable rate of toll or compensation for the transportation of passengers or freight of any description, or for the use and transportation of any railroad car upon its track, or any of its branches thereof, or upon any railroad within this state which it has the right, license, or permission to use, operate, or control, the same shall be deemed guilty of extortion, and, upon conviction thereof, shall be dealt with as hereinafter provided."

The act further provides for the appointment of three railroad commissioners, whose duty it shall be to make reasonable and just rates of freight and passenger tariffs to be observed by all railroad companies doing business in this state on the railroads thereof.

Section 6 of the act declares as follows: "That the said railroad commissioners are hereby authorized and required to make for each of the railroad corporations doing business in this state, as soon as practicable, a schedule of just and reasonable rates of charges for the transporation of passengers and freights and cars on each of said railroads; and said schedule shall, in suits brought against any such railroad corporations wherein is involved the charges of any such railroad corporation for the transportation of any passenger or freight or cars, or unjust discrimination in relation thereto, be deemed and taken in all courts of this state as sufficient evidence that the rates therein fixed are just and reasonable rates of charges for the transportation of passengers and freights and cars upon the railroads; and said commissioners shall, from time to time, and as often as circumstances may require, change and revise said schedule."

Section 9 provides "that if any railroad company doing

business in this state, by its agents or employes, shall be guilty of a violation of the rules and regulations provided and prescribed by said commissioners, and if, after due notice of such violation given to the principal officer thereof, ample and full recompense for the wrong or injury done thereby to any person or corporation, as may be directed by said commissioners, shall not be made within 30 days from the time of such notice, such company shall incur a penalty for each offence of not less than $1,000, nor more than $5,000, to be fixed by the presiding judge. An action for the recovery of such penalty shall lie in any county in the state where such violation has occurred, or wrong has been perpetrated, and shall be in the name of the state of Georgia. The commissioners shall institute such action through the attorney-general or solicitor-general, whose fees shall be the same as now provided by law."

By authority of this act James M. Smith, Campbell Wallace, and Samuel Barnett were appointed railroad commissioners, and were qualified and entered upon the discharge of their duties.

The commissioners, as required by law, prepared and promulgated a standard schedule of just and reasonable rates of charges for the transportation of passengers and freights and and cars, and required it to be observed, with such modifications as might thereupon be set forth by such of the railroad corporations doing business in the state, and that copies of the schedule should be posted by the railroad companies at all their stations, and that the same should go into full effect and operation on May 1, 1880.

Thereupon the complainant in this case, George H. Tilley, who averred himself to be an alien, and a stockholder in the Savannah, Florida & Western Railroad Company, a railroad corporation of the state of Georgia, filed his bill, to which he made the said railroad company, James M. Smith, Campbell Wallace and Samuel Barnett, railroad commissioners, and Robert N. Ely, attorney-general of Georgia, parties defendant.

The bill alleged that the complainant was the holder of 100

shares of the capital stock of the Savannah, Florida & Western Railroad Company, for which he had paid the sum of $10,000 in cash; that the said Savannah, Florida & Western Railroad Company had its origin as follows: By a decree of the United States circuit court for the southern district of Georgia, the property, franchises, rights, privileges, and immunities of the railroad corporation known as the Atlantic & Gulf Railroad Company were sold on November 4, 1879, to Henry B. Plant and his associates; that the purchasers of said railroad and property of the Atlantic & Gulf Railroad Company were the *bona fide* owners of $1,415,000 of the second mortgage bonds of said company, to satisfy which such sale was made, and that their cash bid at the sale was $300,-000, which sum was paid in hand; that said sale was made subject to the lien of a mortgage executed by said Atlantic & Gulf Railroad Company to secure certain bonds issued and sold by it and known as its first mortgage bonds, and that said lien amounted at the time of said sale to about $2,700,-000; that said Plant and his associates, under the provisions of an act of the legislature of Georgia, approved February 29, 1876, had formed the said defendant corporation, the Savannah, Florida & Western Railroad Company, and to it was conveyed under the orders of said court the property and franchises, rights and immunities, of the said Atlantic & Gulf Railroad Company; that the act by virtue of which the said Savannah, Florida & Western Railroad Company was organized and said conveyance made declared that upon the sale of the property, franchises, rights, and immunities of any railroad company in the state of Georgia the railroad company formed by the purchasers thereof should possess all the powers, rights, immunities, privileges, and franchises in respect to such railroad which were promised or enjoyed by the corporation which owned or held such railroad previous to such sale under or by virtue of its charter and any amendments thereto, and of other laws of the state.    Acts 1876, p. 118.

The bill further charged that at the time of making and issuing the said first mortgage bonds, subject to which the Atlantic & Gulf Railroad was sold, the state of Georgia was

a holder of the stock of said company to the amount of $1,000,000, and that as such stockholder the state, acting by her duly-appointed commissioner, voted for the making and issuing of said first mortgage bonds, and contracted with the holders thereof that the corporate property, including the franchises, tolls, and increase of said Atlantic & Gulf Railroad Company, should be pledged for the payment of the principal and interest of said bonds.

The bill further averred that while the state of Georgia was a stockholder, as aforesaid, in the Atlantic & Gulf Railroad Company, said company made contracts with various lumber manufacturers, by which, in consideration of the payment by them of 50 cents per thousand feet for lumber intended for export, the said company agreed to build a branch road from its depot in Savannah to the Savannah river, and in pursuance of said contract did build said branch road at a cost of about $150,000, and the said lumber manufacturers, who have used said branch road, have paid, and continue to pay, without complaint, the said rate of 50 cents per thousand feet for the use of said branch road; that while said Atlantic & Gulf Railroad was under the management of the receivers appointed by the court, under whose decree said sale was made, said receivers, at the instance of the lumber manufacturers along the line of said railroad, laid down side-tracks for their exclusive use, in consideration whereof said lumbermen agreed to pay a rental of $15 per car for the use of said tracks, and they have paid, and continue to pay, said rental. The bill claimed that, under the decree by which said railroad was sold, the purchasers became entitled to the benefit of the said contracts, as a part of the assets and property of the Atlantic & Gulf Railroad Company.

The bill further averred that "the Atlantic & Gulf Railroad Company, the corporation which owned the railroad so purchased, was composed of 'the Atlantic & Gulf Railroad Company,' incorporated under the act of the state of Georgia, approved February 27, 1856, and the original 'Savannah & Albany Railroad Company,' chartered by act of the general assembly of Georgia, approved December 25, 1847, the name

of which was changed to 'The Savannah, Albany & Gulf Railroad Company' by an act approved February 20, 1854. Acts 1855–6, p. 158; Acts 1853–4, p. 454. That these two companies were consolidated by authority of an act of the general assembly of the state of Georgia, approved April 18, 1863, entitled 'An act to authorize the consolidation of the stock of the Savannah, Albany & Gulf Railroad Company, and the Atlantic & Gulf Railroad Company, and for other purposes.' By the third section of said act of consolidation it was enacted 'that the several immunities, franchises, and privileges granted to the said Savannah, Albany & Gulf Railroad Company and the Atlantic & Gulf Railroad Company, by their original charters and the amendments thereof, and the liabilities therein imposed, shall continue in force, except so far as they may be inconsistent with their act of consolidation."

The bill claimed that the two companies aforesaid, which were consolidated, and out of which the Atlantic & Gulf Railroad Company was formed, were granted by their charters the right to charge certain rates of freight and passenger fares specified therein, and that the right to charge the same freights and fares had been conferred upon the Savannah, Florida & Western Railroad Company by the act of February 29, 1876, aforesaid; that the Savannah, Florida & Western Railroad Company had adopted a schedule of freights and passenger fares within the maximum rates fixed by the charter of the Atlantic & Gulf Railroad Company, but that the rates so adopted were greater than those fixed by the schedule of the said railroad commission.

The bill claimed that if the rates established by the railroad commissioners were made obligatory upon the Savannah, Florida & Western Railroad Company, it would not only be unable to establish a sinking fund to pay off its first mortgage bonds, but would be unable to declare dividends of any amount whatever to its stockholders, and the company would be driven into ruin and bankruptcy.

The bill further alleged that complainant had hoped that the said Savannah, Florida & Western Railroad Company

would adhere to the schedule of freights and fares which it had adopted as aforesaid, but that he had been injured, and charged that it intended to abandon said schedule and adopt the one promulgated by said railroad commission, which it admitted would not enable it to earn a sufficient income to pay its expenses, the interest on its bonded debt, but that on the contrary its receipts would not enable it to pay the interest on its bonds by at least $40,000 per annum, and that such deficit would continue from year to year, and the stockholders of said company would receive no dividend whatever, but that the value of the stock of said company would be gradually destroyed by said annual deficit.

The bill averred that said act of October 14, 1879, under authority of which said railroad commissioners assumed to act, was in violation of the several provisions of the constitution of Georgia above quoted, and that it excluded the defendant railroad company from its right of trial by jury, guarantied by the constitution of the state; that it violated that clause of the constitution of the state, paragraph 9, § 1, art. 1, which ordains that excessive fines shall not be imposed, nor cruel nor unusual punishments inflicted; that said act violated that part of the fourteenth amendment to the constitution of the United States which declares that "no state shall deprive any person of life, liberty, or property without due process of law, nor deny to any person within its limits the equal protection of the laws;" and section 10, art. 1, which forbids a state to pass any law impairing the obligation of contracts.

The bill prayed that the Savannah, Florida & Western Railroad Company might be enjoined from doing any act which would be an acceptance of the said statutes of October 14, 1879, as an amendment to its charter, or from carrying out the provisions of said act, or from operating its road for such rates of fare and freight as should be inadequate to yield a revenue sufficient to pay the expenses of operating said railroad, and maintaining its track and equipment, and paying interest on its bonded debt and reasonable dividends to its stockholders, and provide a reasonable sinking fund for the payment of the principal of its bonded debt, and that said

commissioners might be enjoined from prescribing rates of fare and freight over said company's railroad, or in any manner enforcing the provisions of the said act of October 14, 1879, and that the said attorney-general might be restrained from instituting any suit of any kind against said railroad company for the purpose of enforcing the provisions of said act, and for general relief.

Upon the filing of this bill a restraining order was allowed enjoining the defendants as prayed for. Subsequently, on September 6, 1880, the defendant railroad company answered the bill, and on September 18th the railroad commissioners filed a demurrer thereto.

On December 6, 1880, the complainant filed an amendment to his bill, in which he averred that, estimating the stock of the defendant company at $2,000,000, and taking into account the mortgage lien subject to which it was bought, and which amounted to $2,710,000, the entire cost of the railroad and other property was only $14,000 per mile; that the gross receipts of the Atlantic & Gulf Railroad Company for the last eight years, under a schedule substantially higher than that adopted by the Savannah, Florida & Western, were $983,792; that the average interest charges and expenses of the latter company amount to $867,242, leaving a surplus of only $116,550 applicable to dividends and sinking fund, and that allowing a dividend of 7 per cent. on the stock the net receipts would fall short $23,550 per annum; that the receipts of the defendant railroad company under the schedule promulgated by the railroad commissioners would fail to pay the running expenses, the annual interest on prior liens, subject to which the railroad was sold, by nearly $50,000 per annum, and the said amendment charges that the schedule promulgated by said commissioners is not reasonable or just.

On December 22, 23, and 24, 1880, the case was heard upon a motion for an injunction, *pendente lite*, in accordance with the prayer of the bill. Upon this motion the affidavits of John Screven, lately one of the receivers of the Atlantic & Gulf Railroad Company; of W. S. Chisholm, vice-president; H. S. Haines, general manager, and W. P. Hardee, treasurer,

of the Savannah, Florida & Western Railroad Company; and of C. H. Phinizy, president of the Georgia Railroad Company, were read for the complainant, and the affidavit of the railroad commissioners was read in their own behalf.

*Robert Falligant,* for complainant.

*Clifford Anderson,* Att'y Gen., *Robert Toombs,* and *P. L. Mynatt,* for railroad commissioners.

*W. S. Chisholm,* for Savannah, Florida & Western Railroad Company.

WOODS, C. J. The question for solution is whether the case made by this bill and amendment, and the affidavits in support of it, entitles the complainant to the writ of injunction as prayed for in his bill. The first inquiry that arises is, what are the rights of the Savannah, Florida & Western Railroad Company under the law of its organization? On behalf of the complainant it is averred that the railroad company has the right, within limits prescribed by the charter of the Atlantic & Gulf Railroad Company, to fix its own schedule of freight and passenger fares, and that this right is not subject to legislative control.

It is settled that railroad companies are subject to legislative control as to their rates of fare and freight, unless protected by their charters. *Munn* v. *Illinois,* 94 U. S. 113; *Chicago Street R. Co.* v. *Iowa,* 94 U. S. 161.

When the charter of a railroad company allows it to charge maximum rates of fares and freight, but the right is reserved to the legislature to repeal or amend the charter, it may change the rates prescribed by the charter by establishing a maximum limit beyond which they shall not go. *Peik* v. *Chicago, etc., Ry. Co.* 94 U. S. 164.

By the act of the legislature of Georgia of February 29, 1876, entitled "An act to enable the purchasers of railroads to form corporations, and to exercise corporate powers and privileges," under which the Savannah, Florida & Western Railroad Company was organized, it was clothed with all the rights, privileges, and immunities of the Atlantic & Gulf Railroad Company. It is necessary, therefore, to inquire what were the charter rights of the latter company. It was organ-

ized by the consolidation of the Savannah, Albany & Gulf Railroad Company and the Atlantic & Gulf Railroad Company, by authority of an act of the legislature of Georgia, approved April 18, 1863. When this act was passed, sections 1651 and 1682 of the Code of 1863, which took effect January 1, 1863, were in force. The first of these sections declared: "Persons are either natural or artificial. The latter are the creatures of law, and, except so far as the law forbids, are subject to be changed, modified, or destroyed at the will of their creator; they are called corporations." The second declared: "In all cases of private charters hereafter granted the state reserves the right to withdraw the franchise unless such right is expressly negatived in the charter." From these sections of the Code it is apparent that the rights, privileges, and franchises of the Atlantic & Gulf Railroad Company were subject to alteration, amendment, or withdrawal at the will of the legislature. This point has been expressly decided by the supreme court of the United States in the case of *Railroad Co.* v. *Georgia,* 98 U. S. 359. In that case it was held that by the consolidation under the act of April 18, 1863, of the Savannah, Albany & Gulf Railroad Company, and the Atlantic & Gulf Railroad Company, said companies were dissolved and a new corporation (to-wit, the Atlantic & Gulf Railroad Company) was created, and that this new company became subject to the provisions of the Code of Georgia above recited.

And it has been expressly decided by the supreme court of Georgia that all charters granted by the state since the adoption of the Code of 1863 are subject to the provisions of section 1682 above quoted. *West End Co.* v. *Atlanta,* 49 Ga. 151.

It must, therefore, be considered as conclusively settled that the right of the Atlantic & Gulf Railroad Company to establish its own schedule of freight and fares within certain limits was subject to legislative modification and control. The Savannah, Florida & Western Railroad Company, having succeeded to the rights and franchises of the Atlantic & Gulf Company, is subject to the same revisory power.

But, so far as the Savannah, Florida & Western Railroad Company is concerned, the right of legislative control over its franchises has been placed beyond all dispute, if any remained, by section 8 of the act under which the company was organized. That section declares "that nothing in this act shall operate to vest in any purchaser of any railroad and its franchises any exemption from taxation existing or claiming to exist in the corporation which shall have been the owner of said railroad and its franchises, or to limit the powers of the legislature to alter, modify, or withdraw the charter and franchises herein provided."

Complainant says, however, that if the power of the legislature, under the charter of the company, to modify or withdraw its franchises, be conceded, yet this power is now restrained by that paragraph in the bill of rights of the constitution of 1877 which declares "no grant of special privilege or immunities shall be revoked, except in such manner as to work no injustice to corporators or creditors of the incorporation." Paragraph 3, § 3, art. 1, Constitution 1877.

This presents the question whether the act of October 14, 1879, under which the railroad commissioners assume to act, revokes any of the privileges and immunities of the defendant railroad company in such manner as to work injustice to the corporators or creditors of the corporation. That act forbids the railroad corporations of the state, including the defendant railroad company, from charging unfair and unreasonable rates of freight and fare, or making unjust discriminations for the transportation of passengers and freights; and provides for the appointment of a commission to prescribe reasonable and just rates of freight and passenger tariffs, to be observed by all the companies doing business in this state on the railroads thereof. There is certainly nothing in this act hostile to the paragraph in the bill of rights just referred to. The franchise of the defendant company is to fix its own rates of freights and fares within certain limits, subject to the revisory powers of the legislature. It has never had absolute right to establish its own schedule of freights and fares. The right to fix its rates of charges has always been subordinate to leg-

islative control.   How, then, can an attempt on the part of
the legislature to regulate the charges of the defendant com-
pany be considered as an attempt to revoke the special priv-
ileges and immunities of the company?   But this clause in
the bill of rights must be read in connection with paragraph
1, of § 2, of art. 4, of the constitution, which confers upon
the legislature the power and authority of regulating railroad
freights and tariffs, and makes it the duty of the legislature
to prohibit railroads from charging other than just and rea-
sonable rates.

The legislature, in the act of October 14, 1879, *supra,* has
merely forbidden the railroad companies from exacting more
than fair and reasonable rates for the transportation of
freights and passengers, and has attempted, through a com-
mission, to prescribe what are just and reasonable rates.
Upon its face there can be no constitutional objection to this
legislation, excepting on the assumption that it is one of the
special privileges and immunities of the railroad companies
to charge unjust and unreasonable freight rates and fare.

But it is urged by complainant that the rates prescribed by
the commissioners under authority of the legislature are not
just and reasonable, but are oppressive, and destructive of the
value of the property of the railroad companies.   Assuming
for the present that the legislature had the constitutional
right to delegate the power of prescribing rates to a commis-
sion, and that the schedule established by it is the schedule
of the legislature, the question is then presented :  Where does
the power reside to declare what are just and reasonable rates ?
Is it a judicial or legislative question?   It seems to me that
section 2 of article 4 of the constitution, by its very terms, con-
fers that power on the legislature.   It declares—*First,* "the
power and authority of regulating railroad freights and pas-
senger tariffs, preventing unjust discriminations, and requir-
ing reasonable and just rates of freight and passenger tar-
iffs, are hereby conferred on the general assembly, whose duty
it shall be to pass laws to regulate freight and passenger tar-
iffs, to prohibit unjust discrimination, and to prohibit said
roads from charging other than just and reasonable rates."

How a delegation of power to declare what is just and reasonable could be more plain and explicit, it is difficult to see. It is not conferred on the courts; the railroad companies have no part or lot in the decision of the question; but the constitution declares "it is hereby conferred on the general assembly." But even when there is no such constitutional provision as exists in this state, it has been held that "where property has been clothed with a public interest, the legislature may fix a limit to that which shall in law be reasonable for its use. This limit binds the courts as well as the people. If it has been improperly fixed, the legislature, not the courts, must be appealed to for the change." *Peik* v. *Chicago, etc., Ry. Co.* 94 U. S. 164; *Munn* v. *Illinois,* 94 U. S. 113.

Looking, therefore, at the several clauses of the constitution which bear upon the subject, it cannot be said by the railroad companies that an attempt by the legislature to prescribe reasonable rates for the transportation of freights and fares is a revocation of any of their special privileges or immunities. In my judgment the clause of the constitution now under consideration was not meant to limit the power of the legislature over the subject of freights and fares, which is fully treated in section 11, art. 14, but was intended to protect the incorporators and creditors of the corporation from the results which at common law followed the revocation of the charter of an incorporated company, which were that its realty reverted to the grantors and its personalty escheated to the state.

The complainant alleges that when the bonds and the mortgage to secure the same, subject to which the defendant company bought the railroad and other property of the Atlantic & Gulf Company, were executed, the state of Georgia was the owner of 10,000 shares of the stock of the latter company, and this stock voted in favor of the issue of the bonds and the execution of the mortgage; that the bonds bore 7 per cent. annually, and are to fall due July 1, 1877; that the property was conveyed by the mortgage or trust deed to a trustee, with the power upon default of the payment of interest to take possession and operate the road and pay first

expenses; *second,* prior liens; *third,* interest and principal of the bonds; and, *fourth,* the residue to the corporation; but until default the company was to manage the property instead of the trustees.  And he claims that the reserved right of modification or repeal does not apply when such modification will impair a contract like this made by the state herself.  To this there are two answers.  In the first place, the state made no contract when the Atlantic & Gulf Railroad Company issued its bonds and executed its mortgage to secure this.  The bonds and mortgage were the contracts of the company, and not of its stockholders.  *Secondly,* the purchasers of the bonds took them subject to the power of the state to regulate the rates of freight and fares.  The state never, either by express or implied contract, agreed that this power should not be exercised.  The purchasers of bonds took the risk of the validity of the company to do business enough under the provisions and restrictions of its charter, and subject to the right of the legislative revision to pay the principal and interest on the bonds.

The complainant next insists that paragraph 1, § 2, art. 4, of the constitution of Georgia, requires the general assembly itself to regulate railroad freights and passenger tariffs, and prohibit unjust discriminations on the railroads of the state, and prohibit them from charging other than just and reasonable rates, and that the delegation of this duty to these railroad commissioners is not warranted by the constitution. The argument is that the act of October 14, 1879, delegates to the railroad commission legislative power which by the constitution is conferred exclusively upon the legislature. The paragraph of the constitution which authorizes and requires the action of the general assembly on this subject does not, in terms, require that body to prescribe the rates of freights and fares.  It is required "to pass laws to regulate freight and passenger tariffs."  It has, in performance of this duty, declared that the rates charged by the railroad companies should be just and reasonable, and appointed a commission to fix the maximum of just and reasonable rates, beyond which the railroad companies shall not go.  This

action seems to fall strictly within the terms of the authority on which it is based. If, however, the power conferred on the commissioners can only be exercised under the constitution by the legislature, the act conferring such powers must be declared void. A somewhat careful consideration of this point satisfies me clearly that the duties imposed by the act upon the commissioners are not legislative, and are not necessarily to be performed by the legislature. If the act had declared that no railroad company should charge other than just and reasonable rates, and that the board of directors of every railroad company in the state should prescribe maximum charges, which should be posted at each station, and beyond which the ticket and freight agents of the companies should not go, it could not reasonably be claimed that the directors were clothed with legislative power. Is the case altered when the general assembly, instead of making the board of directors the body to fix maximum rates, appoints an independent, and, it is fair to presume, a more impartial body for that purpose? The nature of the duty discharged is not changed by a change in the person or persons on whom the duty is imposed.

It is a familiar rule of constitutional construction that a grant of legislative power to do a certain thing, carries with it the power to use all proper and necessary means to accomplish the end. *McCullough* v. *Maryland*, 4 Wheat. 316.

The general assembly of Georgia is expressly required by paragraph 1, § 2, art. 4, to pass laws from time to time to regulate freight and passenger tariffs, and to prohibit unjust discrimination, and the charging of unjust and unreasonable rates by the railroad companies of the state. The fixing of just and reasonable maximum rates for all the railroads in the state, is clearly a duty which cannot be performed by the legislature unless it remains in perpetual session, and devotes a large portion of its time to its performance. The question, what are just and reasonable rates? is one which presents different phases from month to month, upon every road in the state, and in reference to all the innumerable articles and products that are the subjects of transportation. This ques-

tion can only be satisfactorily solved by a board which is in perpetual session, and whose time is exclusively given to the consideration of the subject.

It is obvious that to require the duty of prescribing rates for the railroads of the state to be performed by the general assembly, consisting of a senate with 44 members, and a house of representatives with 175, and which meets in regular session only once in two years, and then only for a period of 40 days, would result in the most ill-advised and haphazard schedules, and be productive of the greatest inconvenience and injustice, in some cases to the railroad companies, and in others to the people of the state. It is impracticable for such a body to prescribe just and reasonable rates. To insist that this duty must be performed by the general assembly itself, is to defeat the purpose of that clause of the constitution under consideration.

The view taken by complainant would preclude the legislature from the use of the necessary means and agencies to accomplish what it is required by the constitution to do. The congress of the United States gives to congress the power to levy and collect taxes; but this does not require congress itself to assess the property of the tax payer, and collect the tax. The constitution of Georgia clothes the general assembly with the power of taxation over the whole state, and requires taxes to be assessed upon all property *ad valorem.* But this does not require the legislature to investigate through its committees or otherwise, and declare by an act the value of every piece of property in the state subject to taxation.

A familiar instance of the use of agencies by the legislature for the exercise of the power vested in it by the constitution, is found in the creation of municipal corporations, and of the powers of legislation which are commonly bestowed upon them. The bestowal of such powers is not to be considered as trenching upon the maxim that legislative power is not to be delegated, since that maxim is to be understood in the light of the immemorial practice of this country and England, which has always recognized the propriety of vesting in municipal corporations certain powers of local regulation in

respect to which the parties immediately interested may fairly be supposed more competent to judge of their needs than any central authority. Cooley on Constitutional Limitations, 143; *City of Patterson* v. *Society, etc.*, 24 N. J. 385; *Cheany* v. *Hooser*, 9 B. Monroe, 330; *Berlin* v. *Gorham*, 34 N. H. 266.

Even so grave a matter as taxation has always in the state of Georgia even without special constitutional provision been delegated to cities, towns, and county organizations. *Brunswick* v. *Finney*, 54 Ga. 317; *Powers* v. *Dougherty Co.* 23 Ga. 65.

The rule applicable to the delegation of power by a legislature is laid down with great clearness in the case of the *Cincinnati, etc., R. Co.* v. *Clinton Co.* 1 Ohio, St. 77.

The true distinction, therefore, is between the delegation of power to make the law which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made.

The constitution of the state of Illinois, article 4, § 1, declares that "the legislative power should be vested in a general assembly, which shall consist of a senate and house of representatives," etc. Article 13, § 7, of the same constitution, declared that "the general assembly shall pass laws for the inspection of grain for the protection of producers, shippers, and receivers of grain." The legislature of Illinois, with this constitutional provision in force, passed an act to establish a board of railroad and warehouse commissioners. This board was empowered to fix the rate of charges for the inspection of grain, and the manner in which the same should be collected, and to fix the amount of compensation to be paid the chief inspector and other officers, etc. It was objected that this was an unwarrantable delegation of legislative power. But the supreme court of that state held that the right to pass inspection laws belonged to the police powers of the government, and the legislature had the authority to arrange the distribution of said powers as the public exigencies might require, apportioning them to local jurisdictions as the law-making power deemed appropriate, and committing the exercise of the

residue to officers appointed as it might see fit to order, and that it was important for the general assembly to delegate to a commission the power to control the subject of the inspection of grain, and to prescribe what fees should be charged for the inspection of grain, and regulate them from time to time as circumstances might require.

The court says: "The principles repeatedly recognized by this and other courts of last resort, that the general assembly may authorize others to do things which it might properly yet cannot understandingly or advantageously do itself, seems to apply with peculiar force to the fixing of the amount of inspection fees so as to adjust them properly with reference to the expenses of inspection." See, also, *Police Commissioners* v. *Louisville,* 3 Bush, 597; *The People* v. *Shepperd,* 36 N. Y. 285; *The People* v. *Pinckney,* 32 N. Y. 377; *Bush* v. *Shipman,* 4 Scam. 186; *Trustees* v. *Tatman,* 13 Ill. 27; *County of Richland* v. *County of Lawrence,* 12 Ill. 1; *Commonwealth* v. *Duquet,* 2 Yates, 493.

By the authority cited it is held that even if the power conferred on municipal corporations or special commissions be legislative or *quasi*-legislative, still it is within the discretion of the legislature to confer it. My conclusion upon this point is, therefore, that the act of October 19, 1879, is not unconstitutional by reason of a delegation to the railroad commissioners of legislative power.

It is claimed that the law is unconstitutional, because, by declaring that the schedule of rates established by the commissioners shall be held and taken in all the courts as sufficient evidence that the rates therein fixed are just and reasonable, it deprives the railroad companies of their constitutional right to a trial by jury. In this provision the legislature has exercised the power, exercised by all the legislatures, both federal and state, of prescribing the effect of evidence, and it has done nothing more. Even in criminal cases congress has declared that certain facts proven shall be evidence of guilt. For instance, in section 3082 of the United States Revised Statutes, it is provided that whenever, on an indictment for smuggling, the defendant is shown to be in posses-

sion of smuggled goods, "such possession shall be deemed evidence sufficient to authorize a conviction, unless the defendant shall explain the possession to the satisfaction of the jury." The statute books are full of such acts, but it has never been considered that this impairs the right of trial by jury.

But, even if this provision of the act under consideration were unconstitutional, it would not render inoperative the other sections of the statute, from which this provision can be easily removed, and yet leave the main object and purpose of the law unimpaired. *Packet Co.* v. *Keokuk*, 95 U. S. 80.

It is next insisted that the railroad commissioners' act is unconstitutional, because it violates that declaration of the bill of rights, paragraph 1, § 3, which declares "private property shall not be taken or damaged for public uses without just and adequate compensation being first paid." This clause is a regulation of the exercise of the state's right of eminent domain. An act attempting to fix just and reasonable rates of freight and fares upon the railroads of the state can hardly be considered as taking or damaging the property of the railroad for public use. The object of the law is to regulate the charges which the corporation may make in the use of its own property for its own purposes. It does not take it or damage it for public use. The act was passed because its passage was expressly enjoined by the constitution. It does not become obnoxious to the constitutional provision under consideration, and become a taking or damaging of private property for public use, because all the rates fixed are not just and reasonable, or because they are thought so by the railroad companies.

Again, the act under consideration is alleged to be unconstitutional because obnoxious to paragraph 11, § 1, art. 1, of the constitution, which declares, "Protection to person and property is the paramount duty of the government, and shall be impartial and complete;" and of paragraph 3, § 1, art. 1, which declares that "no person shall be deprived of life, liberty, or property without due process of law." When it is remembered that these paragraphs are referred to a law, the

only purpose of which is the performance by the legislature of its constitutional duty to prohibit unjust discriminations and unjust and unreasonable charges by the railroads of the state, it is difficult to see how they are pertinent to the matter.

In *Munn* v. *Illinois*, 94 U. S. 113, it was held that the limitation by legislative enactment of charge for services rendered in public employment, or for the use of property in which the public has an interest, does not deprive the owner of his property without due process of law. Neither can it be said that it is a denial of impartial and complete protection to property.

It is next insisted that the law is one of "a general nature," but that it does not have a uniform operation throughout the state, as required by paragraph 1, § 4, art. 1, of the constitution of the state. The act assailed is an act affecting railroad companies only, and it is designed to have uniform operation on them throughout the state. Its purpose is to require all such companies in the state to charge just and reasonable rates, and to prohibit unjust discrimination by them. To give the law a uniform operation it is not necessary that it should prescribe the same rates for all the railroad companies. It might as well be claimed that the legislature, in framing an act to regulate toll-bridges, must prescribe the same rate of toll for every bridge in the state; otherwise the act would not have a uniform operation. The ingenuity of counsel has brought into the case these various paragraphs of the constitution in the hope that the railroad commissioners' act might be impaled on some one of them. I have considered them all. Most of them have but a very remote application to the law; some of them have already been considered by the supreme court of the United States in *Munn* v. *Illinois*, and *Peik* v. *Chicago*, 94 U. S. *supra*, and decided to have no control over similar legislation.

The act of the legislature, if constitutional, may be considered unwise or even oppressive; but even if it is the remedy is not with the court, but with the legislature. If the general assembly in its passage were acting within the scope of its

constitutional power, no matter how cruel and unjust the law may be, the court cannot apply the remedy. There is nothing in the act complained of which indicates a disposition on the part of the legislature to oppress the railroad companies. It appears to be rather an attempt in good faith to discharge a duty imperatively demanded of the legislature by the state constitution. The complaint is not so much against the legislature as against the railroad commissioners. Their administration of the law is charged to be oppressive and unjust to the railroad company in which the complainant is a stockholder. It is alleged that the schedule of rates fixed by the commissioners for said railroad is, if adhered to, destructive to the railroad property and ruinous to its creditors and stockholders. The evidence submitted upon this point by the complainant, consisting of the affidavits of Mr. Haines, the general manager of the defendant railroad company, and others on the one side, and the affidavit and reports and circulars of the railroad commissioners on the other, is very conflicting and irreconcilable. It is not so much a conflict as to the facts as it is in matters of judgment and inferences from facts. One thing is made clear to my mind by the evidence. It is that there has been an honest and painstaking effort on the part of the commissioners to perform their duty under the law firmly and justly. The difference between the railroad commissioners and the officers of the Savannah, Florida & Western Railroad Company is an honest difference of judgment. The company put the present investment in its road at $4,710,000, and claimed that a profit of 10 per cent. per annum would be just and reasonable. The commissioners placed the value of the investment at $4,000,000, and a just and reasonable profit thereon at 8 per cent. The railroad company estimated its annual expenditure for maintaining and operating the road at $700,000. The commissioners were of opinion that $550,000 would suffice, with good management and proper economy. The officers of the railroad company declare that the rates fixed by the commission will so reduce its income that it will not suffice to pay the running expenses of the road and the interest on its bonded

debt, leaving nothing for dividends to its stockholders.    The railroad commissioners assert that their schedule was framed to produce 8 per cent. income on the value of the road after paying cost of maintenance and running expenses.    Which view is the correct one, it is impossible to decide from the evidence submitted.    There is, however, a conclusive way, and it seems to me it is the only one, by which this controversy can be settled, and that is by experiment.    A reduction of railroad charges is not always followed by a reduction of either gross or net income.    It can soon be settled which is right— the railroad company's officers or the railroad commission—in their view of the effect of the commission's tariff of rates, by allowing the tariff to go into operation.    If it turns out that the views of the railroad company are correct, and that the schedule fixed by the commission is too low to afford a fair return upon the value of the road, the remedy is plain; for the law makes it the duty of the commissioners "from time to time, and as often as circumstances may require, to change and revise said schedules."

This duty the commissioners stand ready to perform, as they testify by their affidavit on file in this case.    In short, they constitute a permanent tribunal, where the complaints of the railroad companies of any action of the commissioners can be made and heard, and any wrong suffered thereby corrected.    In their affidavit on file the commissioners say that they "accompanied their action by circulars indicating their readiness to review their action upon the presentation of sufficient *data*.    The commission may have erred in its judgment.    There was room for honest error.    There was a difference of view in the commission itself as to the proper percentage to be added on the standard tariff rates.    But there was no intention to wrong any interest, nor to adhere to any error when shown to be such. * * * The circulars modifying rates on the showing of the railroads illustrates the desire of the commission to conform by closer and yet closer approximation to improved information."

The railroad company, after testing the results of the schedule of rates fixed by the commissioners, and finding it

to be unjust and unreasonable, can apply to the commissioners for redress. If redress is denied them there, they can apply to the legislature for relief. Believing the law under which the commissioners are appointed to be within the constitutional power of the legislature, the redress must come either from the commissioners or the general assembly; it is not in the power of this court to give relief. As remarked by Mr. Justice Swayne, in *Gilman* v. *Philadelphia*, 3 Wall. 713: "Many abuses may arise in the legislation of the states which are wholly beyond the reach of the government of the nation. The safeguard and remedy are to be found in the virtue and intelligence of the people. They can make and unmake constitutions and laws, and from that tribunal there is no appeal. If a state exercise unwisely the power here in question, the evil consequences will fall chiefly on her own citizens. They have more at stake than the citizens of any other state."

It has been the policy of Georgia, at least since January 1, 1863, to grant no charter which should not be subject to revision or repeal by the general assembly. Whether wise or unwise, this policy has been embodied in the constitution of 1877. It was clearly the purpose of the people, in the adoption of that revision of the organic law, to keep the charges of the railroad companies of the state within legislative control. They were not satisfied with the rules of the common law on this subject. The act of October 14, 1879, is but the practical expression of the will of the people of the state as embodied in their organic law. It is the exercise of a right which they have been careful to reserve, and subject to which the defendant company were allowed to exist as a corporation.

My conclusion is that the act of the legislature of Georgia, approved October 14, 1879, entitled "An act to provide for the regulation of railroad freight and passenger tariffs in this state," etc., etc., is not in violation of either the constitution of the United States or of the state of Georgia; that under the constitution of Georgia power and authority is conferred on the legislature to pass laws to regulate freight and pas-

senger tariffs on railroads, and require reasonable and just rates, and it is its duty to pass such laws, that it may prescribe such rates, either directly or through the intervention of a commission; and that the question whether the rates prescribed by the legislature, either directly or indirectly, are just and reasonable, is a question which, under the constitution, the legislature may determine for itself.

It results from these conclusions that the motion for injunction *pendente lite* must be denied, and the restraining order heretofore allowed must be dissolved; and it will be so ordered.