239 So.2d 577 (1970)
STATE of Florida, DEPARTMENT OF CITRUS, Appellant,
v.
C.V. GRIFFIN, Sr., and C.V. Griffin Groves, a Florida Corporation, Appellees.
No. 38814.
Supreme Court of Florida.
July 22, 1970.
Rehearing Denied September 28, 1970.
*578 Monterey Campbell, of Tomasello, Campbell, Dunlap & Norris, Bartow, for appellant.
Charles E. Davis, of Fishback, Davis, Dominick & Salfi, Orlando, and Robert M. Ervin, of Ervin, Pennington, Varn & Jacobs, Tallahassee, for appellees.
Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, Willard Ayres, of Greene, Ayres, Swigert, Cluster & Tucker, Ocala, and Counts Johnson, Tampa, for Florida Citrus Mutual and Indian River Citrus League as amici curiae.
CARLTON, Justice.
Appellees, members of the Citrus industry, brought suit for declaratory judgment in Circuit Court, Lake County, to test the validity of Fla. Stat. § 601.154, F.S.A., "[The] Orange Stabilization Act of Florida," and of Marketing Order 105-3.01 enacted pursuant to provisions of the Act. The Circuit Court adjudged that Fla. Stat. § 601.154(5), (f), (g) and (h), and § 601.154(12), F.S.A., were unconstitutional, and that the Marketing Order was invalid. This decision is reported in 32 Fla. Supp. 139. Appellant, charged with administration of the Act, has brought a direct appeal to this Court. It is our judgment that the Circuit Court must be reversed.
The Orange Stabilization Act is a legislative response to two great problems which have chronically plagued the citrus industry since its earliest days: first, the problem of meeting market demand after supply is curtailed through occurrence of natural catastrophes such as hurricanes, freezes and droughts; second, the problem of adequately stimulating market demands when supply is overabundant. That the Legislature has the inherent power to address itself to these problems cannot be doubted. It has long been held that this industry is of such vital import to the welfare and economy of this State that police power measures may be taken to safeguard the industry. Sligh v. Kirkwood, 237 U.S. 52, 35 S.Ct. 501, 59 L.Ed. 835 (1915); Fla. Citrus Comm. v. Golden Gift, Inc., Fla., 91 So.2d 657 (1956); Mayo v. Polk Co., 124 Fla. 534, 169 So. 41 (1936); L. Maxcy, Inc. v. Mayo, 103 Fla. 552, 139 So. 121 (1931); Johnson v. State, 99 Fla. 1311, 128 So. 853 (1930).
The specific purposes sought to be achieved by the Act are enumerated in Fla. Stat. § 601.154(1), F.S.A. These purposes include legislative desires: to more effectively correlate the supply of oranges to the demand for them; to establish and maintain orderly marketing for the development of new and larger markets; to eliminate economic waste; to restore and maintain adequate purchasing power for orange producers; and to stabilize the production and marketing of oranges.
These purposes are to be achieved through the medium of marketing orders which must be approved by referendum of the industry after public hearings. While ultimate control over all approved orders is retained by the Commission, a committee composed of members of the industry assists in the administration of each order. Permissible subject matter for the marketing orders is restricted by the Act, and no order can be promulgated which fails to safeguard certain stated interests of the industry.
*579 Any order can be suspended or terminated upon application by a majority of the members of the industry who were responsible for the bulk of the previous season's crop. Also, the Commission itself can terminate or suspend any order if it determines that the order does not tend to effectuate the declared purposes of the Act. Administration of approved orders, and the programs detailed thereunder, are to be funded through the levying of assessments against all standard packed boxes of oranges placed in the primary channels of trade. The aggregate of all marketing order assessments cannot exceed ten cents per box per season.
Pursuant to the provisions of the Act, the Commission held a public hearing on the need for, and feasibility of, selling surplus processed orange juice to the federal government for use in the school lunch programs. Evidence adduced at the hearing supported the following findings: (1) that the industry was on the verge of a great increase in orange productivity due to the current proportion of young trees, soon to bear heavily, to old trees now supplying the bulk of oranges on the market; (2) that this expected increase in productivity would probably outstrip expected demand and, therefore, create a surplus which could be described as potentially disasterous; (3) and that the school lunch program presented a new avenue of distribution which would contribute heavily to utilization of the anticipated surplus, and which would also present an opportunity to inculcate a vast number of young people with an appreciation of, and a desire for, orange juice.
In response to the hearing, the Commission promulgated Marketing Order 105-3.01 which detailed the above findings and which set up an administrative committee for the purpose of preparing and operating programs aimed at securing a part of the federal lunch program market. Section "C" of the order, entitled "Powers and Duties", empowered the committee, subject to the concurrence of the Commission, to "underwrite or subsidize the development or expansion of packaging, dispensing, distributing and marketing techniques and materials best suited to the sale or distribution" of Florida orange products to schools for use by all grade levels. The committee was similarly empowered to underwrite or subsidize the development or expansion of the sale of surplus juices for distribution to schools; underwriting or subsidizing for this purpose was strictly limited by supplementary portions of the order requiring that these activities be geared to the response of the federal government. Section "C" also provided that these activities were to be funded through an assessment of 5¢ per box of oranges delivered into primary channels of trade.
This Order was overwhelmingly approved in a referendum participated in by the affected members of the industry. The producers of more than 86% of the oranges produced in Florida in the preceding shipping season voted for it, as did processors of more than 85% of the Florida oranges processed in the preceding shipping season.
Appellees, members of the industry, felt aggrieved by the assessment and by the scope of the marketing order approved in the referendum. They filed suit for declaratory judgment in which a multitude of questions concerning the legality of the Act and the order were raised. The ultimate holding of the Circuit Court is contained in the following extract from its opinion, 32 Fla. Supp. at 141:
"[I]t is the opinion of this court that the powers attempted to be delegated to the commission in § 601.154(5) subsections (f), (g), and (h), cannot be delegated without more definite and valid guidelines, limitations and restrictions, because the same leave for determination of the commission the decision as to what the law shall be in the attempted delegation contained therein.

*580 "The order which is the subject of this proceeding in the section entitled C. `Powers and Duties' undertakes to set out a program of underwriting and subsidizing the development or expansion of packaging, dispensing, distributing, marketing techniques, materials and the sale of and purchase of processed Florida orange products. Such powers can neither be assumed by the administrative agency, the Florida Citrus Commission, nor delegated by the legislature in the vague and undefined terms contained in the statute and the order. Such would leave to the unbridled discretion of the commission the power to make determinations which are exclusively vested in the legislature by the Constitution of the State of Florida."
Additionally, the Circuit Court held that Fla. Stat. § 601.154(12), F.S.A., providing for assessments not to exceed 10¢ per box per season in the aggregate, was void as an unlimited delegation of power.
Two separate issues confront us in this appeal: first, whether the statutory provisions in question are constitutional; second, whether Marketing Order 105-3.01 exceeded the limits of the authority granted the Commission under the Act.
Few questions are raised with more fervent consistency in constitutional litigation involving administrative agencies than the first question put to us today: Has there been an invalid delegation of legislative power? In the earliest cases on this point, the issue was simply whether or not the Legislature could make any transfer of authority at all. See, e.g., Railroad Commissioners v. P. & A.R.R. Co., 24 Fla. 417, 5 So. 129 (1888). Soon, however, the issue broadened to include the question whether the enactment involved was sufficiently complete in itself. The test then became twofold: first, was a transfer of authority possible; second, if so, was it sufficiently restrictive? We quote from Bailey v. Van Pelt, 78 Fla. 337, 82 So. 789 (1919):
"In order to justify the courts in declaring invalid as a delegation of legislative power a statute conferring particular duties or authority upon administrative officers it must clearly appear beyond a reasonable doubt that the duty or authority so conferred is a power that appertains exclusively to the legislative department, and the conferring of it is not warranted by the provisions of the Constitution.
"The Legislature may not delegate the power to enact a law, or to declare what the law shall be, or to exercise an unrestricted discretion in applying a law; but it may enact a law complete in itself, designed to accomplish a general purpose, and may expressly authorize designated officials within valid limitations to provide rules for the complete operation and enforcement of the law within its expressed general purpose."
This Court has always been of the view that these tests must be tempered by due consideration for the practical context of the problem sought to be remedied, or the policy sought to be effected. In one of our earliest cases on delegation, Railroad Commissioners v. P. & A.R.R. Co., supra, we said that the transfer of rate-making functions from the Legislature to a commission was a sound move in view of the practical inability of the Legislature to effectively cope with the fluid conditions obtaining in the industry. In so holding, we cited with approval the following illustrative excerpt from Tilley v. Savannah, F. & W. Ry. Co., 5 F. 641, 4 Woods 427 (5th Cr. 1881):
"The fixing of just and reasonable maximum rates for all the railroads in the state, is clearly a duty which cannot be performed by the legislature, unless it remains in perpetual session, and devotes a large portion of its time to its performance. The question, what are just and reasonable rates? is one which presents different phases from month to month, upon every road in the state, and in reference *581 to all the innumerable articles and products that are the subjects of transportation. This question can only be satisfactorily solved by a board which is in perpetual session, and whose time is largely given to the consideration of the subject."
And in Bailey v. Van Pelt, supra, after saying that legislative transfers of subordinate functions were permissible, we went on to recognize that:
"This principle of the law is perculiarly applicable to regulations under the police power, since the complex and ever-changing conditions that attend and affect such matters make it impracticable for the Legislature to prescribe all necessary rules and regulations."
Obviously, the very conditions which may operate to make direct legislative control impractical or ineffective may also, for the same reasons, make the drafting of detailed or specific legislation impractical or undesirable. This point was made in State v. A.C.L.R. Co., 56 Fla. 617, 47 So. 969 (1908):
"A direct exercise by the Legislature of the police power is in accordance with immemorial government usage. But the subject-matter may be such that only a general scheme or policy can with advantage be laid down by the Legislature, and the working out in detail of the policy indicated may be left to the discretion of administrative or executive officials."
This is not to imply that a double standard exists. Even where a general approach would be more practical than a detailed scheme of legislation, enactments may not be drafted in terms so general and unrestrictive that administrators are left without standards for the guidance of their official acts. Dickinson v. State of Florida, 227 So.2d 36 (Fla. 1969). But it should be remembered that our Constitution does not deny to the Legislature necessary resources of flexibility and practicality, and when a general approach is required, judicial scrutiny ought to be accompanied by recognition and appreciation of the need for flexibility.
The situation here is a case in point. In our view, the subject matter of the Orange Stabilization Act is such that "only a general scheme of policy can with advantage be laid down by the legislature." But, the Act is also "a law complete in itself" which contains "valid limitations to provide rules for the complete operation and enforcement of the law within its expressed general purpose."
The Circuit Court erred in holding that subsections (f) and (g) of Section (5) of the Act were unconstitutional "because the same leave for determination of the commission the decision as to what the law shall be." Section (5) is concerned with permissible provisions which may appear in marketing orders under the Act. Subsection (f) states that orders may contain: "Provisions for underwriting or subsidizing the development or expansion of new or secondary markets for surplus processed orange products." Subsection (g) states that orders may contain: "Provisions for the borrowing of money by the commission to effectuate the particular marketing order."
These subsections must be considered within the context of the Act itself and its stated purposes. Co-operative participation with the industry by the Commission, which is the very essence of the Act, would be foreclosed without (f) and (g) because the Commission would be powerless to effectuate meaningful programs of market development and expansion without them. Moreover, without subsection (g), no order could be effectuated until well after a shipping season started because only then would assessment revenues become available.
Furthermore, these subsections are not without limitations. Provisions contemplated by (f) must directly relate to the development or expansion of markets for "surplus processed orange products." Also, *582 since all orders are to be funded by assessments and sales, and since the Act does not authorize any pledging of credit by the Commission, it seems clear that underwriting and subsidizing can be undertaken only to the extent that the Commission's obligations for any budgetary period are counterbalanced by anticipated revenue for that budgetary period, whether from assessment or sale.
Provisions contemplated by (g) regarding the borrowing of money appearing in a marketing order must "effectuate the particular marketing order" in regard to which money is borrowed; such money can be used for no other purpose. Additionally, in absence of any authorization for the pledging of credit, money can be borrowed only to the extent that it can be repaid in the budgetary period in which borrowing occurs. In view of these limitations, we find (g) as well as (f) to be constitutional.
Little time need be spent discussing subsection (h) of Section (5) which the trial judge also found to be unconstitutional. This subsection authorizes marketing provisions for the establishment of plans and programs for "advertising, merchandising and sales promotion to create new or larger domestic or foreign markets for oranges" and their products. In Conner v. Joe Hatton, Inc., 216 So.2d 209, 212 (Fla. 1968), we approved similar language employed in Fla. Stat. § 573.17(3) (b), F.S.A. of the Celery and Sweet Corn Marketing Law, and said:
"We have no difficulty in concluding that advertising and sales promotion have such a fixed and definite meaning in connection with the promotion of the fruit and vegetable industry in this state that the limitations upon what may be done in this respect are as clearly defined as though set out verbatim in the statute."
The final statutory provision left for consideration is Fla. Stat. § 601.154(12), F.S.A., which provides for the funding of the Act through assessments levied upon boxes of oranges placed in the primary channels of trade. The constitutionality of this provision was also settled in Conner v. Joe Hatton, Inc., 216 So.2d 209 (Fla. 1968), wherein we approved the levy of assessments as a means of funding the Celery and Sweet Corn Marketing Law. As initially drafted, this Law provided for the levy of assessments, but failed to set any limitation upon the extent to which assessments could be levied. See Fla. Stat. § 573.21 (1965), F.S.A. In the first Conner v. Joe Hatton, Inc., case, 203 So.2d 154 (Fla. 1967), we held that the absence of limitations on the power to assess was constitutionally fatal. The Law was then amended so as to provide that assessments could not exceed 5¢ per box of produce; see Ch. 67-56, Laws of Florida 1967. We approved this amendment in the second Joe Hatton, Inc., case, supra.
The assessment provision before us now is constitutionally acceptable. Fla. Stat. § 601.154(12), F.S.A. provides that "the aggregate of all assessments levied with respect to one or more marketing orders shall not exceed 10¢ per standard packed box." This is much more restrictive than the provision we approved in the second Hatton case which merely set a maximum assessment ceiling of 5¢ per box per order.
The second issue in this appeal is the validity of Marketing Order 105-3.01, which the trial judge invalidated because, in his view,
"[T]he Legislature granted therein [by § 5 of the Act] to the commission only limited powers to buy and sell and that the incidental or inherent powers contained therein are not sufficiently broad to contemplate the action adopted by the commission in the `Powers and Duties,' Section C."
Our preceding discussion of the purposes of the Act, and of the provisions of Section (5), should sufficiently indicate our reasons for reversing the trial court on this issue as well. The subject matter of the order lies within the ambit of the Act, *583 and the powers and duties to be exercised thereunder are compatible with the allowable provisions for marketing orders set out in Section (5).
As was pointed out earlier in this opinion, a multitude of issues were raised in the pleadings when appellees filed suit for declaratory judgment below. The trial court reserved judgment on many of these issues since the case was disposed of on constitutional grounds. Our opinion today is, therefore, limited to the issues raised on appeal.
The judgment appealed from is hereby reversed, and this cause is remanded for further treatment consistent with this opinion.
It is so ordered.
ROBERTS, Acting C.J., DREW, THORNAL, ADKINS and BOYD, JJ., and McLANE, Circuit Judge, concur.